Craig A. ZEBROSKI, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 354, 1997, 378, 1997.

Supreme Court of Delaware.

Submitted: June 2, 1998.
Decided: July 28, 1998.

Brian J. Bartley, Assistant Public Defender, Wilmington, for Appellant.

Timothy J. Donovan, William E. Molchen, and Thomas E. Brown, Deputy Attorneys General, Wilmington, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND and HARTNETT, JJ., and HORSEY, Justice (Retired),[1] constituting the Court en Banc.

VEASEY, Chief Justice:

This is the direct appeal following a capital murder trial and penalty hearing, resulting in a conviction and death sentence. The crime involved was the murder of a gasoline station attendant during the course of an

---

1. Sitting by designation pursuant to Supr. Ct. R. 2 and Del. Const., art. IV, § 38.

attempted robbery. In addition to the statutorily mandated death penalty review, this Court is confronted with three separate allegations of trial error posed by defendant. We affirm the conviction and sentence.

We hold that: (1) the trial court did not abuse its discretion in admitting into evidence a racial epithet attributed to defendant that was related to both the crime and the victim so as to be probative of defendant's state of mind at the time of the incident; (2) the admission by stipulation of the parties of a pre-trial statement given by co-defendant was proper; (3) the approach taken by the trial court was correct in refusing to instruct the jury concerning the lesser included offense of criminally negligent homicide on the ground that there was no rational basis for a verdict convicting defendant of that offense; and (4) the trial court's decision to sentence defendant to death should be affirmed.

## Facts

Evidence presented at trial revealed the following sequence of events. On the afternoon of April 25, 1996, defendant Craig Zebroski visited the apartment of a friend in Boothurst Mansion, an apartment building located in New Castle, Delaware. Among others also present that day at Boothurst Mansion were Michael Sarro and Brian Morris, both friends of Zebroski's. The group spent the day drinking, smoking marijuana and ingesting PCP.[2] Later that day, Zebroski suggested to Sarro that they rob the Conoco gas station on New Castle Avenue in New Castle, Delaware. Zebroski had intended to rob that station two years earlier but had backed out of the plan. He considered the Conoco station a desirable target because it was isolated, open 24 hours a day and attended by only one person at night.

At approximately 11:30 p.m., Zebroski and Sarro set out for the Conoco station, located less than a mile away from Boothurst Mansion. While Zebroski and Sarro watched the

station to ensure that it was empty of customers, Zebroski took Sarro's semi-automatic handgun so as to assume the role of "enforcer." The two entered the station at approximately 3:00 a.m. and found the attendant, Joseph Hammond, sitting in a chair at the desk. Zebroski pointed the gun at Hammond and demanded that he open the cash register. Hammond approached the register but was otherwise unresponsive. Zebroski kept the gun pointed at Hammond, who was now standing three to four feet away from Zebroski. Despite threats from Zebroski and Sarro, Hammond remained unresponsive, and Sarro's attempts to open the register were unavailing. It is undisputed that Zebroski then fired the gun, shooting Hammond in the forehead and killing him instantly.

Zebroski and Sarro ran from the station immediately after Hammond was shot and returned to Boothurst Mansion. Brian Morris testified that, when he asked Zebroski what had happened, Zebroski responded that he "shot the nigger" at the Conoco station at point blank range. Morris also testified that he later saw Zebroski at a party posing for photographs with the gun. Zebroski sold the gun on April 29, 1996, and it was later recovered by police. Zebroski was apprehended on May 1, 1996 at the Motel 6 in New Castle.

Zebroski was indicted on various charges, including primarily two counts of murder in the first degree under 11 *Del. C.* §§ 636(a)(1) and (2).[3] At trial, Zebroski claimed that the shooting was an accident. According to Zebroski, immediately before he fired the gun, Sarro punched Hammond in the face. Zebroski testified that the punch startled him, causing him to flinch and accidentally pull the trigger. The State contended, however, that the shooting was intentional. In support of this position, the prosecution presented testimony from an examiner for the Bureau of Alcohol, Tobacco, and Firearms that

---

**2.** PCP, or phencyclidine, is an illicit synthetic drug. *See* 16 *Del. C.* § 4714(d).

**3.** 11 *Del. C.* § 636(a) provides in pertinent part:

A person is guilty of murder in the first degree when:

(1) The person intentionally causes the death of another person;

(2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, the person recklessly causes the death of another person....

it required 12½ pounds of pressure to be exerted on the trigger for the gun to fire.

Pursuant to a plea agreement signed November 22, 1996, Sarro pleaded guilty under Superior Court Criminal Rule 11(e)(1)(C) to manslaughter, attempted first degree robbery and second degree conspiracy. Rule 11(e)(1) provides as follows:

> *Plea agreement procedure.* (1) In general. The attorney general and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, the attorney general will do any of the following:
>
> (A) File a dismissal of other charges; or
>
> (B) Make a recommendation, or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon the court; or
>
> (C) Agree that a specific sentence is the appropriate disposition of the case.
>
> The court shall not participate in any such discussions. The prosecuting attorney shall comply with 11 *Del. C.* § 5106.[4]

As part of the plea agreement involved in this case, Sarro agreed that (1) his sentencing would be deferred until after the trial or entry of a plea by Zebroski; and (2) he would cooperate with the State's prosecution of Zebroski and would testify truthfully if called as a witness by the State. Although Sarro gave a pre-trial statement, he refused to testify at trial. Consequently, both sides stipulated that the pre-trial statement would be admissible, and the terms of the plea agreement were never revoked.

At the conclusion of the trial, the Superior Court granted Zebroski's request for jury instructions on the lesser included offenses of second degree murder and manslaughter, but declined to provide an instruction on criminally negligent homicide. Zebroski was found guilty by the jury on both counts of murder in the first degree, one count of attempted robbery first degree, three counts of possession of a firearm during the commission of a felony and one count of conspiracy in the second degree.

At the penalty phase of the trial, the jury was presented with evidence in both aggravation and mitigation of Zebroski's crime. The jury voted nine to three that aggravating circumstances outweighed mitigating circumstances and recommended that the Superior Court impose a sentence of death. In its written decision, the Superior Court confirmed the existence of a statutory aggravating circumstance and, after considering and weighing all the evidence, concluded that the statutory and nonstatutory aggravating factors outweighed those in mitigation.[5] The Superior Court sentenced Zebroski to death on August 18, 1997. This appeal and the necessary stay of the carrying out of the death sentence pending appeal followed.[6]

### Admission of the Racial Epithet

Zebroski's first argument on appeal is that the Superior Court erred in allowing testimony concerning a racial remark attributed to him. During trial, Brian Morris testified that, shortly after the incident, Zebroski admitted to shooting Hammond at point blank range because Hammond "wouldn't give up the money." Over the course of its direct examination of Morris, the State elicited the additional testimony that Zebroski, referring to Hammond, declared that he "shot the nigger." Zebroski contends that, at most, the alleged racial

4. Under 11 *Del. C.* § 5106, when the prosecution enters into an agreement with a defendant to accept a plea of guilty to a lesser charge, the prosecuting attorney shall state on the record that the victim was notified and informed of the agreement prior to its entry, or that steps were taken to give such information to the victim. In cases where the victim is deceased, the information shall be given to any next of kin.

5. *State v. Zebroski*, Del.Super., C.A. Nos. IN96–06–1052 through 1056, IN96–05–0699, IN96–05–0701, 1997 WL 528287 (Aug. 1, 1997).

6. *Zebroski v. State*, Del.Supr., No. 354, 1997, Walsh. J. (Aug. 20, 1997) (ORDER) (staying the order of the Superior Court sentencing Zebroski to death).

statement is evidence of an unacceptable point of view. Zebroski argues that the statement alone is not probative of an intent on his part to kill Hammond out of a sense of racial hatred.

■ In admitting the statement at trial over defendant's objection, the Superior Court relied on the State's proffer, based on pre-trial materials, that Morris' testimony would be highly effective in rebutting defendant's contention that the shooting was accidental. The Superior Court concluded as follows:

> [I]t would appear, weighing the evidence under Delaware Rule of Evidence 403, that the probative value of the evidence, including the epithet, outweighs the risk of unfair prejudice. The statements not only represent, if they're believed, admissions by the defendant that he committed the offense, they are highly probative on the defendant's state of mind in terms of his intent and his motive.[7]

We review the ruling of the Superior Court for abuse of discretion.[8]

The admission of the racial epithet in this case, particularly in light of other testimony provided by Morris tending to negate Zebroski's claim of accident, raises special concerns. In *Weddington v. State*, this Court held that the improper injection of race as an issue into a criminal proceeding violates a defendant's constitutional right of due process.[9] The defendant in *Weddington*, a black male, was accused of killing a white female.

On cross-examination, the prosecution asked the defendant whether he had once persuaded two friends to accompany him on a trip to visit the victim with the promise that she and her friends were "loose white women."[10] The prosecutor acknowledged that he had no factual basis for the question and had posed it to the defendant for the purpose of retaliating against the defendant's own attacks of the victim's character.[11] The Court in *Weddington* held that such deliberate attempts to create racial bias against the defendant violated his basic right to a "fair trial that is free of improper racial implications."[12]

■ It is established that the introduction by the prosecution of racial material in a criminal proceeding violates the Due Process Clauses of both the United States and Delaware Constitutions in cases where the purpose for such introduction is to establish a defendant's abstract belief and/or to create bias against the defendant.[13] We find, however, that the racial statement admitted in Zebroski's trial is distinguishable from such cases, both in its relevance and in the purpose for its admission. Morris' testimony concerning the way he heard Zebroski refer to the victim evidences a plain feeling of contempt held by Zebroski toward Hammond and is therefore probative of Zebroski's intent and state of mind at the time of the shooting. We agree with the Superior Court that the remark, though unfortunate and possibly inflammatory, was "tied into the offense and . . . tied into the specific victim of the offense."[14] From the record, we find no

---

7. Trial transcript at 123. Under D.R.E. 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

8. *Zimmerman v. State*, Del.Supr., 628 A.2d 62, 65 (1993); *see also Lampkins v. State*, Del.Supr., 465 A.2d 785, 790 (1983) (holding that the decision whether to admit testimony as relevant is within the sound discretion of the trial court); *Williams v. State*, Del.Supr., 494 A.2d 1237, 1241 (1985) ("The determination of whether the probative value of a particular piece of evidence is substantially outweighed by the danger of unfair prejudice is a matter which falls particularly within the discretion of the trial judge, who has the first-hand opportunity to evaluate relevant factors.").

9. Del.Supr., 545 A.2d 607, 615 (1988).

10. *Id.* at 610.

11. *Id.* at 610, 614.

12. *Id.* at 614–15.

13. *Id.; see Dawson v. Delaware*, 503 U.S. 159, 166–67, 112 S.Ct. 1093, 1098, 117 L.Ed.2d 309 (1992) (holding that admission of evidence of racial animus was error where the evidence proved nothing more than defendant's abstract beliefs).

14. *See Duonnolo v. State*, Del.Supr., 397 A.2d 126, 128–29 (1978) (holding that remark attributed to defendant that he was going to "kill him a nigger," though inflammatory, was relevant to

indication that the Superior Court abused its discretion when it determined that evidence of Zebroski's declared racial epithet was relevant and sufficiently probative. We hold that the introduction into evidence of the racial epithet in the context of this case was proper where the evidence indicated more than mere abstract belief and was relevant to the issues involved.[15]

### Sarro's Refusal to Testify

Next, Zebroski argues that the trial court erred by acknowledging what he perceived to be an invocation by Sarro of his Fifth Amendment right to remain silent. Zebroski contends that, as a consequence of a plea agreement entered into between Sarro and the State, Sarro did not retain his privilege against self-incrimination. According to Zebroski, the Superior Court's erroneous recognition of the privilege resulted in a presentation to the defense of a "Hobson's Choice," whereby the defense could only (1) stipulate to the admissibility of Sarro's pre-trial statement and relinquish confrontation rights or (2) forego the evidence altogether. Having chosen the former avenue, Zebroski now alleges that the admission of the taped statement, necessitated by the trial court's alleged error, violated his confrontation rights under the United States and Delaware Constitutions.

■ We begin by addressing the foundation for defendant's claim—namely, that Sarro's plea agreement with the State operated as a waiver of his Fifth Amendment privilege against self-incrimination. A voluntary plea agreement embodies a bargain struck between an accused and the prosecution whereby a guilty plea is exchanged for sentencing concessions. By entering a guilty plea under a plea agreement, a defendant detrimentally relies on the promises of a prosecutor and often relinquishes substantial constitutional rights, including the Fifth Amendment privilege against compulsory self-incrimination.[16] Upon such reliance, the State may not withdraw from a plea agreement and must uphold its end of the relied-upon bargain during sentencing before the trial court.[17] In the event that a defendant proceeds to breach any subsequent obligations under the plea agreement, the prosecution may, if the plea agreement so provides, move to vacate defendant's agreed-upon conviction and sentence, reimposing the original charges without violating double jeopardy principles.[18] Conversely, should the prosecution fail to uphold its commitment under the plea agreement by breaching a promise upon which a guilty plea is based, the resulting conviction cannot stand.[19]

■ Although Sarro entered a guilty plea pursuant to an agreement with the State in this case, the agreement was inchoate until consummated. Thus, we conclude that his Fifth Amendment privilege against self-incrimination remained intact. Sarro was not granted immunity with respect to his trial testimony. Under the terms of the agreement, Sarro's sentencing was deferred until after the disposition of Zebroski's case. Sarro's obligation to testify therefore arose at a time when the agreement was still susceptible to being nullified upon the occurrence of either of two alternative events: (1) a breach of the plea agreement by the State or (2) a refusal on the part of the court to accept the plea agreement. Consequently, when Sarro took the stand in Zebroski's trial, the deferral of both the State's obligation to perform

---

defendant's state of mind minutes before homicide).

**15.** *Id.* at 128–30; *Barclay v. Florida*, 463 U.S. 939, 949, 103 S.Ct. 3418, 3424, 77 L.Ed.2d 1134 (1983) (allowing sentencing judge to take into account defendant's racial animus towards his victim where such animus was related to the murder).

**16.** *Mabry v. Johnson*, 467 U.S. 504, 507–08, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984); *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969).

**17.** *Shields v. State*, Del.Supr., 374 A.2d 816, 820 (1977).

**18.** *Ricketts v. Adamson*, 483 U.S. 1, 10, 107 S.Ct. 2680, 2685–86, 97 L.Ed.2d 1 (1987).

**19.** *Mabry*, 467 U.S. at 509, 104 S.Ct. 2543; *see also Shields*, 374 A.2d at 818–20 (recognizing that the remedy of specific performance of a plea agreement may be available to a criminal defendant where the prosecution breached promises upon which the defendant had relied).

and the consummation of the agreement left Sarro with a real and substantial threat of prosecution on his original charges.[20] Regardless of the risk that Sarro's refusal to testify may have posed to him for failing to fulfill the terms of the plea agreement (including exposure to trial on the original charges against him), we hold that the constitutional privilege against self-incrimination was nevertheless available to Sarro at the time of Zebroski's trial.

 The following excerpts of the colloquy on this issue at trial reveal that Sarro, through counsel, was cognizant of his Fifth Amendment privilege and that Zebroski voluntarily waived his confrontation rights by stipulating to the admission of Sarro's pre-trial statement:

MR. APOSTOLICO: Your Honor, I think we would ask the Court to advise Mr. Sarro that there are penalties for refusing to testify after being called as a witness in a case.

MR. BERNSTEIN: Your Honor, if I could interject. I would assert to the Court, as I did a few minutes ago, I believe Mr. Sarro at this point has a Fifth Amendment right to refuse to testify.... [I]f Mr. Apostolico is asking the Court to order Mr. Sarro to testify, I would object on the ground that he has a Fifth Amendment privilege and we could revisit the issue at some perhaps more appropriate time....

\* \* \*

MR. APOSTOLICO: After consultation with Mr. Sarro, it's clear that he is not going to testify in this case.... The defense and State have essentially stipulated that [Sarro's pre-trial] statements may be admissible.... And it's fair to say, I believe, that the reason why the defense has stipulated to this is essentially for strategic reasons, and the State has agreed.

MR. WINSLOW: ... [T]he defense wants to stipulate to the admissibility to the [pre-trial] statements.... So we do hereby stipulate to their admission as evidence....

THE COURT: I gather, Mr. Winslow, for purposes of the record that you've made the decision that although there may be things in Mr. Sarro's statement that are not helpful to the defense, there are other things in the statements that are helpful and so it is in the defendant's best interests to use those [statements]?

MR. WINSLOW: Yes, and for other reasons.

THE COURT: Very well.[21]

Contrary to Zebroski's contention on appeal, the Superior Court did not rule on the apparent invocation by Sarro of what we hold to be an existing constitutional privilege against self-incrimination. Rather, the ambiguous state of the record at trial was mooted by the way the parties themselves resolved the issue of Sarro's refusal to testify.

As evident from the above-quoted colloquy, when Sarro refused to honor his agreement to cooperate with the State by testifying truthfully at Zebroski's trial, the Superior Court granted a request by the parties for a reasonable amount of time to consult with Sarro in an effort to encourage him to testify. When that meeting proved fruitless, the parties immediately announced their stipulation that Sarro's pre-trial statement would be admissible, without requesting sanctions or contempt proceedings. Although the Superior Court confirmed defense counsel's belief that it was in Zebroski's best interest to admit the taped statement and allowed the parties to proceed accordingly, there was never any ruling by the court because the stipulation of the parties obviated the need for a ruling. The record clearly indicates that the defense wanted Sarro's statement admitted for strategic reasons and because admission of the statement was thought by the defense to be in the defendant's best interest. Accordingly, we hold that Zebroski's contention on appeal that the Superior Court erroneously recognized a Fifth Amendment testimonial bar and consequently deprived Zebroski of his confrontation rights is without merit.

---

**20.** *Marchetti v. U.S.,* 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968).

**21.** Trial transcript at 48–49; 54–56.

### Jury Instruction

■ Zebroski's next allegation is that the Superior Court erred by not instructing the jury on criminally negligent homicide as a lesser included offense of first degree murder. Pursuant to 11 *Del. C.* § 206(c), a "court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense."[22] Accordingly, we focus our inquiry on whether the facts of this case provided a rational basis for acquitting Zebroski of first degree murder and instead convicting him of criminally negligent homicide.

Under 11 *Del. C.* § 231(d), "[a] person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct." In this case, the Superior Court could find no rational basis supporting a conviction for criminally negligent homicide where the defendant, familiar with firearms and their use, intentionally pointed a loaded gun at the victim's face. We agree with the Superior Court's conclusion that, under the facts of this case, no jury could reasonably find that Zebroski's conduct was anything less than reckless.

■ Moreover, the jury's verdict in this case reflects the factual determinations that Zebroski intentionally caused the death of Hammond and that, in the course of an attempted commission of a felony, Zebroski recklessly caused the death of Hammond.[23] Assuming, *arguendo*, that the Superior Court's failure to instruct the jury on criminally negligent homicide could be deemed an error, the jury's rejection of all lesser included offenses in favor of first degree murder rendered that error harmless.[24]

### Statutorily Mandated Review of Zebroski's Death Sentence

■ Bearing in mind that "death as a punishment is unique in its severity and irrevocability," this Court must conduct a mandatory, limited review of the Superior Court's imposition of a death sentence.[25] In *Wright*,[26] this Court set forth the framework that governs death penalty review. Under 11 *Del. C.* § 4209(g)(2)b, the Court examines the evidence in the record to determine whether it supports the Superior Court's findings of statutory aggravating circumstances. The Court then addresses both determinations required by subparagraph a. of Section 4209(g)(2).[27] Under this analysis, the Court first considers whether the imposition of the death penalty was arbitrary or capricious. Second, the Court considers whether the death penalty in the present case was disproportionate to that imposed in similar cases. When undertaking these inquiries, this Court must consider as a whole the aggravating and mitigating evidence as they bear upon the circumstances of the crime and

22. *See also Dutton v. State*, Del.Supr., 452 A.2d 127, 146 (1982) (not error to refuse instruction on lesser included offense where there is nothing in the record that would support a jury finding under the particular instruction sought); *Ward v. State*, Del.Supr., 575 A.2d 1156, 1159 (1990) (to warrant an instruction on a lesser included offense, the evidence introduced in the case must support a jury verdict convicting the defendant of the lesser crime rather than the indicted crime); *Bailey v. State*, Del.Supr., 521 A.2d 1069, 1093–94 (1987).

23. *See* 11 Del. C. §§ 636(a)(1) and (2).

24. *Lilly v. State*, Del.Supr., 649 A.2d 1055, 1062–63 (1994).

25. 11 *Del. C.* § 4209(g); *Pennell v. State*, Del. Supr., 604 A.2d 1368, 1375 (1992).

26. *Wright v. State*, Del.Supr., 633 A.2d 329 (1993).

27. 11 *Del. C.* § 4209(g)(2) provides in pertinent part:

 The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:
 a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

the character of the defendant.[28]

### (a) Statutory Aggravating Circumstance

Zebroski does not argue that the evidence was insufficient to support the Superior Court's finding of a statutory aggravating circumstance. The jury found that Zebroski committed the murder of Hammond while attempting to commit a robbery.[29] Accordingly, this statutory aggravating circumstance was established as a matter of law.[30]

### (b) Death Penalty Not Arbitrary or Capricious

The Superior Court determined that the State had proven by substantial and reliable evidence that a number of non-statutory aggravating circumstances were present in this case. The court found that Hammond's murder had a devastating impact on his family, friends and co-workers. Zebroski had a lengthy prior criminal history that began at age 12 and included an escape from a detention center. The various treatment alternatives tried on Zebroski either failed or went uncompleted, seriously undermining "any hope that he might improve." The court determined that the nature and circumstances surrounding the murder were senseless and cruel. Zebroski's character showed significant propensities for violence and other criminal conduct, and his remorselessness was evidenced by photographs in which he posed with the murder weapon as well as by his attempts to fabricate false defenses. Zebroski was on juvenile probation when he committed the murder. Finally, Zebroski had planned previously to rob the Conoco station, but backed out at the last minute.

The Superior Court found that there was reliable evidence to support several mitigating circumstances that were relevant to the details of the offenses and to Zebroski's character and propensities. The court listed these circumstances as follows: Zebroski's youth;[31] the fact that he has a family that loves him; the dysfunctional nature of his family;[32] the presence of friends who continue to support him; Zebroski's history of psychological problems and disorders; his history of substance abuse and addiction; the debilitating effects of alcohol and drugs on Zebroski's capacity for decisionmaking; the favorable prognosis for positive adjustment to prison; and Zebroski's punishment relative to his codefendant, Sarro.

The court found, however, that every one of the mitigators alleged by Zebroski was double-edged. The evidence showing that Zebroski had degenerated so thoroughly at such a young age indicated that the damage inflicted on him by his family and during his childhood was irreparable. While Zebroski's mother is deeply attached to her son, it is apparent that she was unable to instill values in or control Zebroski. Nor was she able to curb or stop the abuse inflicted by Zebroski's father and string of step-fathers. Zebroski's "friends," though loyal, seem to display similar disregard for law and society. The severity of Zebroski's psychological problems and drug dependence is alarming and indicative of permanent damage. Zebroski's tenure in prison could very well be marred by the same propensities and friendships that existed before his incarceration for the present crime. Finally, the ultimate severity of the punishment in this case was found by the trial judge to be warranted by the very active role that Zebroski took in the murder.

The Superior Court articulated the grounds for its decision to impose the death penalty in this case in a fifty-two-page writ-

---

**28.** *Wright*, 633 A.2d at 339.

**29.** 11 *Del. C.* § 4209(e)(1)j.

**30.** *See Ferguson v. State*, Del.Supr., 642 A.2d 772, 785 (1994); *Steckel v. State*, Del.Supr., 711 A.2d 5 (1998).

**31.** At the time of the murder, Zebroski was 19 years old.

**32.** This mitigating circumstance was in turn supported by the following factors: the alcoholism and mental health problems suffered by Zebroski's mother; the adverse conditions of his childhood development; the presence of numerous stepfathers with substance abuse problems; physical and mental abuse suffered by Zebroski as a child; observed physical and mental abuse inflicted by Zebroski on his mother and siblings; the desertion of Zebroski by his natural father; and the lack of appropriate male role models in Zebroski's life.

ten opinion. After carefully weighing the aggravating and mitigating circumstances, the court concluded as follows:

> On balance, after the statutory weighing process, the Court is constrained to conclude that by a preponderance of the evidence the aggravating circumstances qualitatively outweigh the mitigators. Based on sufficient evidence, the jury has concluded unanimously and beyond a reasonable doubt that Defendant committed a dastardly crime. He took a defenseless man's life for no reason. Now, thanks to Defendant, a widow is in mourning. An innocent family is grief stricken. And people who work behind counters at night must eye the door even more nervously, fearing that a masked gunman could barge in and shoot them in the face.[33]

The balancing of aggravating and mitigating circumstances is not a quantitative exercise, "but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present."[34] The record reflects that the court considered the totality of the evidence and decided to impose the death sentence only after conducting a deliberate, rational and logical deductive process.[35] We hold that the Superior Court did not impose the death sentence on Zebroski either arbitrarily or capriciously under 11 *Del. C.* § 4209(g)(2)a.

### (c) Death Penalty Proportionality Review

■ In addressing this final statutorily-mandated inquiry, the Court refers to the "universe" of cases involving first degree murder charges that have included a penalty hearing and after the conclusion of which the sentence has become final.[36] An exact com-

parison of these cases is untenable, but a review of some objective factors, including the gravity of the offense, the circumstances surrounding the crime, and the harshness of the penalty is helpful in reaching a determination of whether or not this case fits within a pattern of Delaware death sentence precedent.[37]

Zebroski argues that his death sentence is disproportionate. In support of his contention, he cites the case of *State v. Dickerson*,[38] in which the trial judge imposed a sentence of life imprisonment contrary to a jury recommendation of death by a vote of 9–3. *Dickerson* involved two defendants, one of whom paid the other to shoot the victim over a personal dispute. After weighing the evidence presented with respect to each defendant, the trial judge in *Dickerson* determined that, by a preponderance of the evidence, aggravating factors did not outweigh those going toward mitigation, notwithstanding the jury's recommendation. The mitigating factors that weighed most heavily in favor of life imprisonment for both defendants in *Dickerson*, in the view of the Superior Court, included a lack of violent propensities or substantial disciplinary problems; a history of cooperation with correctional authorities; and observed efforts toward rehabilitation and personal and scholastic achievement.

■ The record in Zebroski's case, however, reflects the existence of one statutory aggravating circumstance and numerous non-statutory aggravating circumstances. Furthermore, the factors weighing in mitigation here do so with ambivalence. Zebroski's crime is one for which the death penalty has often been imposed in Delaware: "an unprovoked, cold-blooded murder of a person who

---

33. *Zebroski*, Op. at 40.

34. *Stevenson v. State*, Del.Supr., 709 A.2d 619, 639 (1998) (quoting *State v. Cohen*, Del.Supr., 604 A.2d 846, 849 (1992)).

35. *Red Dog v. State*, Del.Supr., 616 A.2d 298, 310 (1992).

36. *Lawrie v. State*, Del.Supr., 643 A.2d 1336, 1344 (1994); *Stevenson*, 709 A.2d at 640. Although changes in the Delaware death penalty statute enacted in 1991 create dissimilarities be-

tween cases decided before and after that year, pre–1991 decisions are nevertheless pertinent to proportionality review. *Lawrie*, 643 A.2d at 1350.

37. *Manley v. State*, Del.Supr., 709 A.2d 643, 661 (1998).

38. Del.Super., No. IN90–12–1038 through 1041 (July 14, 1992).

lacked the ability to defend himself." [39] Moreover, the evidence shows that Zebroski murdered Hammond for pecuniary gain.[40] Accordingly, we hold that the imposition by the Superior Court judge of a death sentence in this case was not disproportionate to sentences imposed on other defendants in the relevant "universe" of criminal cases.

### Conclusion

After careful review of the record and consideration of the issues in this case, we reject Zebroski's claims of trial error. We confirm the presence of one statutory aggravating circumstance as a matter of law and conclude that the death sentence was imposed on Zebroski neither arbitrarily nor capriciously. We have also determined that Zebroski's sentence is not disproportionate to sentences imposed in other first degree murder cases under the Delaware death penalty statute. Accordingly, the underlying convictions and judgments, including the judgments imposing sentences of death for each count of murder in the first degree, are affirmed.

The matter is remanded to the Superior Court for further proceedings consistent with this opinion and the setting of a new date of execution.[41] This Court's order of August 20, 1997, staying the execution of Zebroski's death sentence, shall terminate upon the issuance of this Court's mandate. The Clerk of this Court is directed to cause a copy of this opinion to be delivered forthwith to the attorneys for the parties and to the Commissioner of the Department of Correction.

## APPENDIX
### CASES DECIDED UNDER 11 *Del. C.* § 4209
### As Amended in 1991 by 68 Del. Laws Ch. 189 [42]

| Case Name: | Meri–Ya C. Baker |
| Case Number: | IN90–12–1038 thru 1040 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 360, 1992, 1993 WL 557951, Holland, J. (Dec. 30, 1993) (ORDER) |

| Case Name: | Jermaine Barnett |
| Case Number: | IN97–02–1238, 1131, 1334 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | Automatic and direct appeals pending |

| Case Name: | Hector S. Barrow |
| Case Number: | IN97–02–1353, 1356, 1359 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | Automatic and direct appeals pending |

| Case Name: | Tyreek Brown |
| Case Number: | IN98–03–0260 thru 0264 |
| County: | New Castle |
| Sentence: | Life |
| Decision on Appeal: | Direct appeal pending |

**39.** *Ferguson,* 642 A.2d at 789; *Gattis v. State,* Del.Supr., 637 A.2d 808, 823 (1994); *Sullivan v. State,* Del.Supr., 636 A.2d 931, 950–51 (1994).

**40.** *Sullivan,* 636 A.2d at 950–51; *see also Wright,* 633 A.2d at 343; *DeShields v. State,* Del.Supr., 534 A.2d 630, 649 (1987).

**41.** *See* Super. Ct.Crim. R. 61(*l* ).

**42.** The universe of cases prior to 1991 is set forth in prior opinions by this Court, and those appendices are incorporated herein by reference. *See, e.g., Lawrie v. State,* Del.Supr., 643 A.2d 1336, 1352–56 (1994).

| Case Name: | James B. Clark, Jr. |
|---|---|
| Case Number: | IN94–06–0543 through 0548 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 672 A.2d 1004 (1996) |

| Case Name: | Charles M. Cohen |
|---|---|
| Case Number: | IN90–02–0474 thru 0477 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No direct appeal taken |

| Case Name: | James T. Crowe |
|---|---|
| Case Number: | IN95–12–1167 thru 1169 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | Direct appeal pending |

| Case Name: | David F. Dawson |
|---|---|
| Case Number: | IK86–12–0024; IK87–01–0834 thru 0847 |
| County: | New Castle (venue changed) |
| Sentence: | Death |
| Decision on Appeal: | 637 A.2d 57 (1994) |

| Case Name: | Byron S. Dickerson |
|---|---|
| Case Number: | IN90–12–1041, 1042 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 353, 1992, 1993 WL 541913, Veasey, C.J. (Dec. 21, 1993) (ORDER) |

| Case Name: | Cornelius E. Ferguson |
|---|---|
| Case Number: | IN91–10–0576, 0578 thru 0581 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 642 A.2d 772 (1994) |

| Case Name: | Robert A. Gattis |
|---|---|
| Case Number: | IN90–05–1017 thru 1019, 1106, 1107 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 637 A.2d 808 (1994) |

| Case Name: | Arthur Govan |
|---|---|
| Case Number: | IN92–10–1586 thru 1596 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 363, 1993, 1995 WL 48359, Walsh, J. (Jan. 30, 1995) (ORDER) |

| Case Name: | Aldrich Hackett |
|---|---|
| Case Number: | IN96–08–0401, 0403, 0404 and IN96–09–0035 thru 0037 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | Direct appeal pending |

| Case Name: | Robert W. Jackson, III |
|---|---|
| Case Number: | IN–92–04–1222 thru 1227; IN92–04–1348 and 1349 |
| County: | New Castle |

Sentence: Death
Decision on Appeal: 684 A.2d 745 (1996)

Case Name: Mark Anthony Kirk
Case Number: IN96–12–0754 and 0755, IN97–01–1773 thru 1776,
 IN96–12–0556
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: Direct appeal pending

Case Name: David J. Lawrie
Case Number: IK92–08–0179 thru 0185; IK92–09–0148 and 0149
County: Kent
Sentence: Death
Decision on Appeal: 643 A.2d 1336 (1994)

Case Name: Thomas M. Magner
Case Number: IN96–01–0258 and 0259, IN96–01–1421 thru 1425
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No. 224, 1997, Walsh, J. (July 29, 1998) (ORDER)

Case Name: Michael R. Manley
Case Number: IN95–11–1323 thru 1325, IN95–12–0684 thru 0686
County: New Castle
Sentence: Death
Decision on Appeal: 709 A.2d 643 (1998)

Case Name: Frank W. Moore, Jr.
Case Number: IS92–09–0001, 0002, 3001
County: Sussex
Sentence: Life Imprisonment
Decision on Appeal: No. 214, 1993, 1994 WL 202289, Holland, J.
 (May 9, 1994) (ORDER)

Case Name: Jack F. Outten
Case Number: IN92–01–1144 and 1145
County: New Castle
Sentence: Death
Decision on Appeal: 650 A.2d 1291 (1994)

Case Name: James W. Perez
Case Number: IN93–12–1191 thru 1202
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No. 207, 1993, Moore, J. (Feb. 3, 1994) (ORDER)

Case Name: James Allen Red Dog
Case Number: IN91–02–1495 thru 1503
County: New Castle
Sentence: Death
Decision on Appeal: 616 A.2d 298 (1992)

Case Name: Jose Rodriguez
Case Number: IN93–02–1208, 1209, and 1211 thru 1219
County: New Castle
Sentence: Life Imprisonment
Decision on Appeal: No. 466, 1993, 1994 WL 679731, Walsh, J.
 (Nov. 29, 1994) (ORDER)

Case Name: Nelson W. Shelton

| | |
|---|---|
| Case Number: | IN92–01–1154 and 1155 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 652 A.2d 1 (1995) |

| | |
|---|---|
| Case Name: | Steven W. Shelton |
| Case Number: | IN92–01–1149 and 1150 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 650 A.2d 1291 (1994) |

| | |
|---|---|
| Case Name: | Donald J. Simmons |
| Case Number: | IN92–01–0770 thru 0772; IN92–01–1140 and 1141 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No direct appeal taken |

| | |
|---|---|
| Case Name: | Brian David Steckel |
| Case Number: | IN96–06–1761 and 1762, IN96–06–1765 thru 1767, IN96–06–1773 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 711 A.2d 5 (1998) |

| | |
|---|---|
| Case Name: | David D. Stevenson |
| Case Number: | IN95–12–0687 thru 0689, IN95–11–1047 thru 1049 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 709 A.2d 619 (1998) |

| | |
|---|---|
| Case Name: | Willie G. Sullivan |
| Case Number: | IK92–01–0192 thru 0196; IK92–02–0001; IK92–03–0022 |
| County: | Kent |
| Sentence: | Death |
| Decision on Appeal: | 636 A.2d 931 (1994) |

| | |
|---|---|
| Case Name: | Antonio L. Taylor |
| Case Number: | IK94–06–0047 through 0052 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | 685 A.2d 349 (1996) |

| | |
|---|---|
| Case Name: | Charles H. Trowbridge |
| Case Number: | IK91–07–0175, IK–91–06–0032 thru 0034 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No. 234, 1995, 1996 WL 145788, Veasey, C.J. (Mar. 4, 1996) (ORDER) |

| | |
|---|---|
| Case Name: | John E. Watson |
| Case Number: | IN91–09–0020 thru 0025 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on Appeal: | No direct appeal taken |

| | |
|---|---|
| Case Name: | Dwayne Weeks |
| Case Number: | IN92–10–1605 and 1611 |
| County: | New Castle |
| Sentence: | Death |
| Decision on Appeal: | 653 A.2d 266 (1995) |

Case Name: Roy R. Williamson
Case Number: S93–05–0249 thru 0255 and S93–05–1249 and 2249
County: Sussex
Sentence: Life Imprisonment
Decision on Appeal: 669 A.2d 95 (1995)

Case Name: Jermaine M. Wright
Case Number: IN91–04–1947, 1948, and 1950 thru 1953
County: New Castle
Sentence: Death
Decision on Appeal: 671 A.2d 1353 (1996)

Case Name: Craig A. Zebroski
Case Number: IN96–09–1816 thru 1822
County: New Castle
Sentence: Death
Decision on Appeal: Del.Supr., 715 A.2d 75 (1998)