Jordan BENTLEY, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 387, 2006.

Supreme Court of Delaware.

Submitted: March 7, 2007.

Decided: June 11, 2007.

Nicole M. Walker, Esq. (argued), Office of the Public Defender, Wilmington, Delaware, for Appellant.

John Williams, Esq. (argued) and James T. Wakely, Esq., Department of Justice, Wilmington, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, and RIDGELY, Justices.

RIDGELY, Justice.

Appellant Jordan Bentley appeals his Superior Court convictions of Murder First Degree, Possession of a Firearm During the Commission of a Felony and Possession of a Deadly Weapon by a Person Prohibited. In this case, the State contended that Bentley acted without any co-conspirator or accomplice in killing Joseph "Lucky" Cox. After a State witness, Tina Creed, changed her testimony about Bentley being the shooter, the prosecution contended in its closing argument that this was because of her romantic involvement with Bentley. Earlier in the trial, Bentley attempted to show that Creed was biased due to her recent romantic relationship with his uncle, Arthur "Joey" Bentley. Bentley also sought to prove facultative impairment of Creed through cross-examination of her about her drug use. At the time of Bentley's trial, Creed and Joey were co-defendants on pending charges involving conspiracy and illegal drugs. Creed asserted her Fifth Amendment privilege against self-incrimination to all of Bentley's questions on her relationship with Joey and her drug use. The Superior Court sustained her claim of privilege.

Bentley makes three arguments on appeal. First, he contends that the trial court erred by precluding his cross-examination of Tina Creed on bias and impairment due to her drug use. Second, Bentley contends that the trial court improperly denied his request to instruct the jury on the lesser included offense of manslaughter. Finally, Bentley contends that the trial court erred when it admitted into evidence a video of Bentley spitting on a news camera. We find that the limitation of Bentley's cross examination of Creed, without striking either part or all of Creed's testimony from the record, created at least a substantial danger of prejudice to Bentley's right to a fair trial.

In the alternative, the State could have sought use immunity for her testimony under 11 *Del. C.* § 3506 so that her assertion of her Fifth Amendment privilege would be unnecessary. Creed's testimony was pivotal to the determination of whether Bentley or another person killed the victim in this case. Although a grant of use immunity would have allowed for full cross examination of Creed, the State proffered Creed's testimony without it. Because Bentley has demonstrated at least a substantial danger of prejudice from the denial of any cross examination of Creed on her bias, we must reverse and remand for a new trial. In this opinion, we also will address Bentley's remaining arguments, which we find to be without merit, for the guidance of the parties and the Superior Court at the new trial.

**I.**

On September 1, 2004, Joseph "Lucky" Cox and Wayne Caldwell went to Hardee's Restaurant in Dover to visit Tina Creed. They arranged to meet after Creed's shift ended, and at that time Lucky gave her a ring he had bought for her. Creed told Lucky that she could not accept the ring and drove both Lucky and Caldwell home. She later discovered that Lucky had left the ring in her car.

Later that day, Creed told her boyfriend, seventeen-year old Bentley, that she had received a ring from Lucky. They tried to return the ring to the jeweler but were unsuccessful. According to Bentley's cousin, Roland "Buddy" Pyle, Bentley then called Lucky and told him that he was coming over and that they had "something to handle." According to Bentley, it was Buddy who suggested that they go talk to Lucky. Buddy wore his steel-tipped Timberland boots that he wears when he plans to fight.

Buddy and Creed testified at trial that they next went to Bentley's home where Bentley picked up a .32 pistol that he had purchased from a friend about a month earlier. They both also testified that Bentley forced Creed to drive them to Lucky's house. Buddy said that he wore a white t-shirt, jeans and brown boots and Bentley wore "a black t-shirt with a white t-shirt underneath, blue jeans and white shoes" the evening of the shooting.

Lucky was shot four times by either Bentley or Buddy. The police were only able to find two casings at the scene of the shooting. Two bullets were found in Lucky's body. It could not be determined whether all the shots came from the same weapon. No physical evidence found at the scene indicated who the actual shooter was. The gun used to kill Lucky was not recovered.

The State did not prosecute this case as a conspiracy or on an accomplice liability theory. The prosecution was premised upon the ground that Bentley intentionally killed Lucky on his own. At trial, the central issue was the killer's identity. Buddy testified that Bentley shot Lucky. Bentley testified that Buddy shot Lucky and that he (Bentley) was unaware that Buddy had a weapon with him when they went to Lucky's home.

Creed told Bentley's counsel before trial that it was Buddy who had the gun. At trial, she changed her story. She first said that she saw Bentley shoot Lucky. On cross examination, Creed admitted that pretrial she told defense counsel Buddy was the shooter. Ultimately, Creed testified that she could not see who shot Lucky because a car blocked her view.

Other witnesses, Joseph Alan Cox ("Joseph Alan"), Lucky's uncle, and a neighbor, Khalilah Harmon, testified without adding clarity to the identity of the killer. Joseph Alan was at Lucky's trailer when Buddy, Bentley and Creed arrived. He testified that he saw a man wearing a white t-shirt yell at Lucky and then shoot him. As stated earlier, Buddy acknowledged at the trial that he was wearing a white t-shirt that day. Ultimately, Joseph Alan testified that he was unable to identify the shooter.

Harmon identified Bentley as the one with the gun, but acknowledged that she might have identified Buddy as having the gun in a statement she made before trial. She further testified that Creed was hunched over in her car when the shooting took place and that Creed's vehicle was separated from Lucky's trailer by another vehicle.

After Lucky was shot, Buddy, Bentley and Creed all fled the scene of the shooting to Millsboro, Delaware where they waited for Bentley's mother. The next morning, Bentley's mother informed the trio that the police were after them. All four of them then drove to Washington, D.C. in Bentley's mother's truck. The following day, Buddy suggested that they go to his father's house in Ohio. The police spotted the group on the Pennsylvania Turnpike while Bentley's mother was driving. A high-speed chase ensued. At some point during the chase, Bentley's mother became hysterical and Bentley took the wheel. The chase went on for more than eighty miles. The truck was finally stopped when the police threw spikes in the road to puncture its tires.

Bentley was indicted on the charges of Murder First Degree, Possession of a Firearm During the Commission of a Felony and Possession of a Deadly Weapon by a Person Prohibited and convicted of all charges. After he was convicted of all charges, he was sentenced to life imprisonment plus six years on the weapons offenses. This appeal followed.

## II.

■ Bentley first argues that his rights to confrontation and cross examination were violated when he was not permitted to question Creed on her potential bias because of her relationship with Bentley's uncle, Joey. He also challenges the trial judges ruling precluding cross examination about her ability to perceive the events based on her drug use. We review the Superior Court's evidentiary rulings for abuse of discretion.[1] To the extent constitutional rights were violated, we review *de novo*.[2]

■ "A primary interest secured by [the Confrontation Clause of the Sixth Amendment] is the right of cross-examination...."[3] A trial judge has "wide latitude" in controlling the contours of a cross examination.[4] However, "the right of cross examination is not without limits."[5] This Court, especially when considering possible bias and motivations of a witness, looks to whether the jury had enough evidence to sufficiently draw inferences about the reliability of a witness and whether "defense counsel had an adequate record from which to argue why the witness might have been biased...."[6]

After Creed testified on direct examination at trial, defense counsel sought to impeach her credibility by asking her questions about her prior drug use[7] and her relationship with Bentley's uncle, Arthur "Joey" Bentley. In compliance with the instruction of the trial judge, Bentley's counsel proffered in writing 35 questions for Creed.[8] Defense counsel argued that

---

1. *Dollard v. State*, 838 A.2d 264, 266 (Del. 2003).

2. *Spencer v. State*, 868 A.2d 821, 822 (Del. 2005); *Capano v. State*, 781 A.2d 556, 607 (Del.2001).

3. *Snowden v. State*, 672 A.2d 1017, 1024 (Del. 1996) (citations omitted).

4. *Id.* at 1025.

5. *Id.* at 1024.

6. *Id.* at 1025 (citing *Weber v. State*, 457 A.2d 674, 681–82 (Del.1983)).

7. Six months after the homicide, on March 24, 2005, Creed was arrested for twelve drug charges and conspiracy and Joey was identified as her co-defendant.

8. Those questions were:
   1. Were you using drugs in September 2004?
   2. What drugs were you using at that time?
   3. Did you continue to use drugs during the period after September 2004?
   4. Did you sniff cocaine during the period after September 2004?
   5. Did you take E pills during the period after September 2004?
   6. Did you shoot up cocaine during the period after September 2004?
   7. Did you shoot up heroine during the period after September 2004?
   8. Did you do speed balls during the period after September 2004?
   9. What are speed balls?
   10. Did you use crack during the period after September 2004?
   11. Did you use drugs everyday during the period after September 2004?
   12. Do you know what an 8 ball is?
   13. Who is Rachel?
   14. Would she give you drugs during the period after September 2004?
   15. Who is Nicole?
   16. Would she give you drugs during the period after September 2004?
   17. Who is Becky?
   18. Would she give you drugs during the period after September 2004?
   19. Who is Joey? (Albert Bentley)
   20. Did he give you drugs during the period after September 2004?
   21. Is Joey related to Jordan Bentley?
   22. Did you have a sexual relationship with Joey?
   23. When did you start your sexual activity with Joey?
   24. Is that the same time that you stopped visiting Jordan?
   25. Did you ever tell Jordan about your sexual relationship with Joey?

Creed's history with drugs would cast into doubt her ability to perceive or remember the shooting and surrounding events. Bentley's counsel also argued that Creed's relationship with Joey would establish bias or motive for the changes in her testimony. That is, if Bentley was incarcerated, she would be able to continue her relationship with Joey without interference from her former boyfriend, Bentley. With her own counsel present, Creed refused to answer the questions and asserted her privilege against self-incrimination because of the pending drug related charges against her, including a criminal conspiracy with Joey. After an extensive colloquy, the trial judge barred any inquiry into those matters, explaining "I don't want anything to implicate her as a conspiracy [sic] in these drug charges...."[9]

The sustaining of Creed's Fifth Amendment privilege is not at issue in this appeal. What is at issue is the alleged denial of Bentley's Sixth Amendment right to confront a witness who testified against him. The record shows that Creed's bias and motive for changing her testimony ultimately determine which of her versions of the shooting the jury would believe. The jury made that determination without hearing about her relationship with Joey. This relevant evidence contradicted the State's position that she changed her story because she was biased in favor of Bentley.

During closing arguments, the prosecutor argued to the jury that Creed's testimony changed because she was trying to protect Bentley, who was "the love of her life."[10] To protect Bentley, he argued, Creed originally told defense counsel that Buddy did it and that is why she later testified that she could not see the shooter. According to the State's theory, because Creed was protecting Bentley, her version incriminating him was the version the jury should believe. The defense, on the other hand, relied upon Creed's first version that identified Buddy as the shooter. According to the defense's theory, supported by evidence the jury did not hear, Creed later identified Bentley as the shooter because her relationship with him was over. She was having an affair with Joey which could continue without interference from Bentley, her former boyfriend, should Bentley be incarcerated. Bentley's argument

---

26. Did the drugs affect your memory as to the events that happened on September 1, 2004?

27. Did you ever lie to Jordan about your sexual relationship with Joey?

28. When did you finally tell Jordan about your sexual relationship with Joey?

29. Did you tell Jordan's mother ... about your sexual relationship with Joey?

30. Did you tell Jordan's grandmother ... about your sexual relationship with Joey?

31. How long have you known Joey?

32. Did you know Joey on September 1, 2004?

33. Did you tell Joey what happened on September 1, 2004?

34. Did you tell Joey the same story you told the Jury last week?

35. Did you tell Joey that Jordan was not the shooter on September 1, 2004?

9. The trial judge permitted the prosecutor to ask Creed if she had been arrested in the previous month on drug charges and if she was "facing a considerable amount of time" on the charges. Creed answered yes to both questions. The prosecutor asked Creed if she had been given any incentive to testify against Bentley. She admitted that when she was arrested on the above-mentioned drug charges, the police officer questioning her had implied that "testifying against [Bentley] could help me out with dropping some of my charges."

10. The prosecutor argued through summation that her testimony could be explained by her desire to protect Bentley. The prosecutor also said, "Why did [Creed] change her testimony? Do you think [Creed] was still trying to protect the defendant? They had been dating for four years, they had lived together. They had written letters."

could not be made. When Creed exercised her Fifth Amendment privilege any testimony from her supporting Bentley's theory could not be admitted absent a grant of immunity. Nor could Bentley confront Creed on her motive or bias for changing her testimony.

■ We recognize that a defendant's Sixth Amendment right to confrontation is not absolute. As the United States Supreme Court explained in *Kastigar v. United States*,[11] "[t]here are a number of exceptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against self-incrimination. The privilege reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty."[12]

■ The U.S. Court of Appeals for the Third Circuit has addressed the interplay between a witness's right against self-incrimination and a defendant's right to confront adverse witnesses in *United States v. Dalfonso*.[13] A witness' invocation of the Fifth Amendment does not automatically entitle a defendant to a new trial.

"A criminal defendant is not entitled to a new trial merely because a government witness has exercised his Fifth Amendment privilege to remain silent during cross-examination on a collateral matter relating to credibility."[14] Instead, the "defendant must at least show a substantial danger of prejudice flowing from the absence of such testimony."[15] If the invocation of the privilege merely precludes inquiry into collateral matters, there is no substantial danger of prejudice to the defendant.[16] There is a substantial danger of prejudice, however, if the invocation of the privilege "precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part."[17] If there is a substantial danger of prejudice, the witnesses' direct testimony must be stricken from the record.[18] In the alternative, and to avoid having the testimony stricken, a prosecution witness may be granted use immunity by court order upon the request of the State, if the require-

**11.** 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**12.** *Id.* at 444, 92 S.Ct. 1653. The right against self-incrimination is broad and "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Id.* at 445, 92 S.Ct. 1653; *see Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) ("This provision of the Amendment must be accorded liberal construction in favor of the right it was intended to secure. The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a ... crime.").

**13.** *United States v. Dalfonso*, 707 F.2d 757, 762 (3d Cir.1983).

**14.** *Id.*

**15.** *Id.*

**16.** *United States v. Newman*, 490 F.2d 139, 145 (3d Cir.1974) ("Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him....").

**17.** *Id.* ("The Sixth Amendment right of confrontation requires appellate courts to reverse convictions where it appears that the cross-examination of government witnesses has been unreasonably limited.").

**18.** *Id.*

ments of 11 *Del. C.* § 3506 are met.[19]

On the facts of this case, the motive of Creed for changing her testimony and her relationships with Bentley *and* Joey were not collateral matters. Creed's assertion of her Fifth Amendment privilege, given the pending conspiracy and drug charges, deprived Bentley of his right to test the truth of Creed's direct testimony. It did not simply deprive him of an opportunity to test Creed's credibility on an unrelated issue. Although Creed's testimony changed, the State was able to offer an explanation for those changes to the jury while Creed's assertion of her Fifth Amendment privilege deprived Bentley of the opportunity to offer a contradictory explanation. Bentley could not offer the contrary explanation that the motive was not to protect him but to convict him.

This was a close case. Creed was, in effect, the tie-breaking witness on the critical issue of the identity of the shooter. The substantial danger of prejudice from the preclusion of cross examination on her romantic relationship with Joey could have been avoided if the prosecution had sought use immunity for Creed's testimony under 11 *Del. C.* § 3506. The State did not do so.[20] With use immunity, Creed would not have been able to invoke her Fifth Amendment privilege and Bentley's proposed questions could have been asked.[21] We

---

**19.** 11 *Del. C.* § 3506 provides:

(a) In any criminal action or in any investigation carried on by the grand jury, if a person refuses to answer any question or to produce evidence of any kind solely on the ground that the person may thereby be incriminated, the Superior Court, upon motion of the Attorney General, may order such person to answer the question or produce the evidence after notice to the witness and a hearing. Provided, however, the Court shall not enter such order if the Court finds:

(1) That such person may be subjected to criminal prosecution relating to the same transaction or occurrence under the laws of the United States or any other state and that any such evidence so compelled could be used against the person in any such prosecution; or

(2) Such order would otherwise be clearly contrary to the public interest. Such person, so ordered by the Court, shall comply with the Court order. After complying, such person shall not be prosecuted or subjected to penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order, the person gave answer or produced evidence; provided that, but for this section, such person would have been privileged to withhold the answer given or the evidence produced. In no event, however, shall such person, acting pursuant to such order, be exempt from prosecution or penalty or forfeiture for any perjury, false statement or contempt committed in answering or failing to answer, or in producing or failing to produce evidence in accordance with the order, and any testimony or evidence so given or produced shall not by virtue of this section be rendered inadmissible in evidence upon any criminal action, investigation or proceeding concerning such perjury, false statement or contempt.

(b) No statement or other evidence obtained from any person who shall have been compelled to make such statement or produce such evidence by any court of competent jurisdiction of the United States or of any other state pursuant to a claim of privilege and court order under a statute substantially equivalent to subsection (a) of this section shall be admissible in evidence in any criminal prosecution in this State against such person arising out of the same transaction or occurrence.

**20.** At oral argument in this appeal, no explanation was provided by the State in response to our inquiry into why use immunity was not sought for Creed.

**21.** *See Kastigar,* 406 U.S. at 446–47, 92 S.Ct. 1653 ("Immunity statutes ... have deep roots in Anglo–American jurisprudence.... [T]hey seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify. The existence of these statutes reflects the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime.... [E]v-

hold that Bentley's conviction must be reversed because he has shown that the limitation on his cross examination of Creed created a substantial danger of prejudice to his right to a fair trial.

## III.

■ Because a new trial is required, we will address Bentley's remaining arguments to provide guidance to the parties and the Superior Court. Bentley next claims that the trial court should have instructed the jury on manslaughter, a lesser included offense of first degree murder. The trial judge found that there was no rational basis in the record to support jury instructions on lesser included offenses. We review the denial of requested jury instructions de novo.[22]

■ Lesser included offense instructions "provide the jury with a less dramatic alternative than the sharp choice between conviction of the offense charged and acquittal."[23] Indeed, the United States Supreme Court recognized in Beck v. Alabama[24] that "providing the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard."[25] If "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense," due process under both the United States Constitution[26] and

Delaware law[27] requires that the jury be so instructed. A jury should be instructed on a lesser included offense if the following four criteria are met:

First, the defendant must make a proper request. Second, the lesser included offense must contain some but not all of the elements of the charged offense. Third, the elements differentiating the two offenses must be in dispute. Fourth, there must be some evidence that would allow the jury to rationally acquit the defendant on the greater charge and convict on the lesser charge.[28]

■ In Henry, this Court explained that the standard to establish the fourth prong is not particularly demanding. Generally, conflicting testimony as to the element that distinguishes the charged offense from the lesser included offense satisfied the fourth prong. "[A] defendant is entitled to an instruction on a lesser included offense if there is any evidence fairly tending to bear upon the lesser included offense, 'however weak' that evidence may be."[29]

The difference between the offense of manslaughter and first degree murder involves state of mind. For first degree murder, the State must prove an intent to "cause[ ] the death of another person."[30] Bentley argues that the definition of manslaughter within 11 Del. C. § 632(2) applies

ery State in the Union, as well as the District of Columbia and Puerto Rico, has one or more such statutes.").

22. Keyser v. State, 893 A.2d 956, 960 (Del. 2006).

23. Henry v. State, 805 A.2d 860, 864 (Del. 2002).

24. 447 U.S. 625, 633, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

25. Id.

26. Beck, 447 U.S. at 635–38, 100 S.Ct. 2382.

27. 11 Del. C. § 206(c); Capano, 781 A.2d at 628 (citing Zebroski v. State, 715 A.2d 75, 82 (1998)).

28. Henry, 805 A.2d at 864 (citations omitted).

29. Id. at 865 (citing United States v. Humphrey, 208 F.3d 1190, 1207–08 (10th Cir. 2000)).

30. 11 Del. C. § 636(a)(1). The State did not prosecute Bentley and Buddy as accomplices.

to the facts of this case. Section 632(2) requires that one act "[w]ith intent to cause serious physical injury to another person" but actually "cause[ ] the death of such person, employing means which would to a reasonable person in the defendant's situation, knowing the facts known to the defendant, seem likely to cause death." [31] Therefore, in order to receive this lesser included instruction, there must have been some evidence showing that Bentley intended to inflict serious bodily injury upon Lucky but did not intend to kill him.

Bentley argues that under one version of the events, the jury could have concluded that Bentley believed that only a physical altercation was going to take place (i.e., Buddy put on his steel boots, making Bentley think he was going to "kick [Lucky] in the mouth," and Buddy and Creed's testimony that they did not believe Bentley was going to shoot anyone). As the State correctly notes, however, the only conflicting testimony presented in this case is *who* shot Lucky, not *if* the shooter intended to kill Lucky. Bentley testified that he believed that *Buddy* was going to beat up or get involved in a physical altercation with Lucky. He did not testify that he intended to get involved in any physical altercation with Lucky. In other words, Bentley's defense was that Buddy committed the murder, not that he intended to cause serious bodily injury and death unexpectedly resulted. We find no error by the Superior Court in denying the proposed jury instruction given the evidence presented at trial.

## IV.

Bentley's final claim is that the trial court erred when it allowed the jury to watch a video tape showing that Bentley spit on a news camera as he was leaving the courthouse. Bentley argues that admission of the tape violates D.R.E. 403.[32] "The determination whether the probative value of evidence is outweighed by the risk of undue prejudice 'falls particularly within the discretion of the trial judge, who has the first-hand opportunity to evaluate relevant factors.' " [33] Bentley testified that he cooperated with police throughout the proceedings. Thus, he opened the door to this contradiction evidence on his demeanor. The trial court did not abuse its discretion when it concluded that it was probative of "how [Bentley] conducted himself after he was taken into custody."

## V.

The judgments of the Superior Court are REVERSED. This matter is REMANDED for a new trial consistent with this opinion.

---

**31.** 11 *Del. C.* § 632(2).

**32.** D.R.E. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of

undue delay, waste of time or needless presentation of cumulative evidence."

**33.** *Winn v. State*, 625 A.2d 280 (Del.1993) (TABLE) (citing *Williams v. State*, 494 A.2d 1237, 1241 (1985)).