**Paul E. WEBER, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 74,2008.

Supreme Court of Delaware.

Submitted: Jan. 21, 2009.
Decided: April 22, 2009.
Reargument Denied May 1, 2009.

Leo John Ramunno, Wilmington, for appellant.

Kevin M. Carroll, Department of Justice, Wilmington, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices constituting the Court en banc.

STEELE, Chief Justice:

Paul E. Weber appeals his Superior Court convictions of Attempted First Degree Robbery and Attempted First Degree Carjacking. Based on Weber's Attempted Robbery conviction, the trial judge declared Weber a habitual offender and sentenced him to 25 years at Level V. For the conviction on Attempted Carjacking, the trial judge sentenced Weber to 3 years at Level V, suspended after 2 years, followed by Level IV Home Confinement. On appeal, Weber claims that the trial judge violated his right to a fair trial by: (1) denying his motion for a judgment of acquittal; (2) denying his motion for a continuance; and (3) sentencing him as a habitual offender. Weber also argues that he did not receive a speedy trial. Because the trial judge erred by failing to instruct the jury on Offensive Touching as a lesser included offense of First Degree Robbery,

we must reverse that conviction and remand for a new trial. We find no merit to the remainder of Weber's arguments and affirm Weber's conviction of Attempted First Degree Carjacking.

## FACT AND PROCEDURAL BACKGROUND

On August 18, 2004, at approximately 10 p.m., Weber approached Frederick Naspo at the Shell gas station on the corner of Duncan Road and Kirkwood Highway in Wilmington, Delaware. Seeing an unlit cigarette in Weber's mouth, Naspo told him: "I hope you're not going to smoke that because I'm going to pump gas." The parties dispute what, if anything, Weber said in response. Naspo claims that Weber attempted to wrestle away Naspo's car keys and to steal his car. After a brief struggle with the seventy four year old Naspo, Weber fled in the direction of Duncan Road. Naspo sought shelter in the gas station and the gas station attendant called the police.

Delaware State Police Sergeant Mark Hawk responded to the scene. Naspo described his assailant as "a white male, approximately 35 years old, 5′6″, 5′7″ in height, short brown hair, no facial hair, approximately 160 pounds.... The person was wearing jean shorts and a blue t-shirt." As Hawk interviewed Naspo, New Castle County Police Officer Bernard Alimenti responded to a complaint about a person knocking on doors in the nearby Dunlinden Acres development and asking for a ride to an unknown destination.[1] Patrolling the area, Alimenti encountered Weber, who was wearing blue jeans and a large blue t-shirt. Alimenti stopped and detained Weber outside of a Sleepy's mat-tress store. Hawk brought Naspo to the Sleepy's store to determine whether Naspo could identify Weber as his assailant. Naspo did not identify Weber as his attacker, and the officers released Weber.

Because the gas station attendant did not have access to the station's video surveillance system, Hawk returned the next day to view the surveillance tape. Upon reviewing the tape, Hawk independently identified Weber as Naspo's assailant. He then obtained a warrant to arrest Weber. Hawk went to Weber's home to execute that warrant and found Weber wearing only his underwear. Hawk "asked permission [from Weber] to go get clothing for him ... and [Weber] told [Hawk] to go to his room to get his clothing." Hawk went to Weber's bedroom and picked up the first clothing items that he saw lying on the floor, "a pair of long jeans and an oversized blue t-shirt."

A grand jury indicted Weber on charges of Attempted First Degree Robbery and Attempted First Degree Carjacking. A New Castle County jury convicted Weber on both charges, and the State moved to declare Weber a habitual offender in relation to both convictions. At sentencing, the State orally amended its petition and requested habitual offender sentencing only for the Attempted Robbery conviction. The trial judge granted that petition and sentenced Weber as a habitual offender to 25 years at Level V for the Attempted Robbery conviction; and for the Attempted Carjacking conviction, to 3 years at Level V, suspended after 2 years. This appeal followed. A panel of three justices reviewed this matter on the briefs and requested supplemental briefing on two issues.[2] Upon consideration of those supplemental briefs, the panel recommended

---

1. Alimenti testified that Dunlinden Acres is "[b]asically cattycorner across the street" from the Shell gas station.

2. Specifically, we asked the parties to address: (1) Appellant Weber's claim that his 2001 conviction of Forgery in the Second Degree could not be used as a predicate of-

oral argument and determination by the Court *en Banc.*

## DISCUSSION

### I. Weber's Right to a Fair Trial.

■ Weber first claims that "the conduct, actions and rulings" of the trial judge violated his right to a fair trial. Specifically, Weber argues that the trial judge: denied his request for an instruction on a lesser included offense; engaged in *ex parte* communications with the jury on several occasions; made improper statements to him and to his counsel; and allowed the jury access to the prosecutor's laptop. We review *de novo* claims alleging the infringement of a constitutionally protected right.[3]

#### A. The denial of Weber's request for a lesser included offense instruction.

■ Weber first claims that the trial judge erred by denying his request for a

jury instruction on Offensive Touching[4] as a lesser included offense of First Degree Robbery[5]. The trial judge concluded that Offensive Touching is not a lesser included offense of First Degree Robbery, and that in any event, there was no rational basis to convict Weber on Offensive Touching. Because the trial judge did not give the requested instruction, we review Weber's claim *de novo* to determine: (i) whether the instruction was available as a matter of law; and, if so, (ii) whether the evidence presented at trial supported a conviction on the lesser included offense.[6]

As we noted in *Herring v. State,* "Appendix B of the 1973 Delaware Criminal Code with Commentary sets forth the following as illustrative of included offenses of Robbery in the First Degree ... § 601 Offensive Touching. . . ."[7] Therefore, the trial judge erred by concluding that Offensive Touching is not a lesser included offense of First Degree Robbery.

fense for habitual offender status purposes because, given the sentence imposed, appellate review of that conviction was unavailable; and (2) Appellant Weber's claim that he was denied his right to a speedy trial.

3. *Keyser v. State,* 893 A.2d 956, 961 (Del.2006) (citing *Capano v. State,* 781 A.2d 556, 607 (Del.2001); *Seward v. State,* 723 A.2d 365, 375 (Del.1999)).

4. A person is guilty of offensive touching when the person intentionally "touches another person either with a member of his or her body or with any instrument ... or strikes another person with saliva, urine, feces or any other bodily fluid, knowing that the person is thereby likely to cause offense or alarm to such other person." 11 *Del. C.* § 601(a).

5. A person is guilty of first degree robbery when, "in the course of committing theft, the person uses or threatens the immediate use of force upon another person with intent to ... [p]revent or overcome resistance to the taking of the property ... or [c]ompel the owner of the property or another person to deliver up

the property [...]" and "in the course of the commission of the crime or of immediate flight therefrom, the person ... (1) [c]auses physical injury to any person who is not a participant in the crime; or (2) [d]isplays what appears to be a deadly weapon or represents by word or conduct that the person is in possession or control of a deadly weapon; or (3) [i]s armed with and uses or threatens the use of a dangerous instrument; or (4) [c]ommits said crime against a person who is 62 years of age or older." 11 *Del. C.* §§ 831(a) and 832(a).

6. *Wright v. State,* 953 A.2d 144, 148–49 (Del. 2008). *See also, e.g., Miller v. State,* 893 A.2d 937, 948 (Del.2006) (citing *Lilly v. State,* 649 A.2d 1055, 1061 (Del.1994); *Ward v. State,* 575 A.2d 1156, 1159 (Del.1990)) (holding that "[t]he prosecution or the defense is entitled to a lesser included offense instruction if the crime not charged is in fact a lesser-included offense, and if there is a rational basis in the evidence to convict the defendant of the lesser crime rather than the greater.").

7. 805 A.2d 872, 875 n. 6 (Del.2002).

The trial judge, however, was "not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." [8] This standard applies even where the defendant denies any involvement in the charged offense.[9] "A defendant is entitled to an instruction on a lesser included offense if there is any evidence fairly tending to bear upon the lesser included offense, however weak that evidence may be." [10]

At trial, the State argued that the record did not support a conviction on Offensive Touching because that offense "would require the victim to have testified that it caused some annoyance or alarm to him." The trial judge agreed with the State's interpretation of the record and the law.

We conclude, however, that a conviction for Offensive Touching does not require proof that the victim actually felt offended or alarmed. In relevant part, 11 *Del. C.* § 601 defines Offensive Touching as a person intentionally "touch[ing] another person either with a member of his or her body or with any instrument ... knowing that the person is thereby likely to cause offense or alarm to such other person." This definition focuses on the actor's intent and knowledge before touch-

ing another person, not on that other person's resultant mental state.

After carefully reviewing the record, we find sufficient evidence to support an acquittal of the First Degree Robbery charge and a conviction of the lesser included offense of Offensive Touching. Although Weber primarily argued at trial that he was not the person identified on the surveillance video accosting Naspo, Weber also questioned the State's evidence that the person in the video actually attempted to steal Naspo's car. Weber's defense counsel attempted to impeach Naspo by demonstrating that his trial testimony did not entirely match his original statement to the police.[11] The surveillance video shows a brief struggle between Naspo and another man but does not conclusively establish that the man attempted to steal Naspo's car. If the jury did not find Naspo's testimony entirely credible, they could have concluded that the State failed to prove beyond a reasonable doubt that Weber attempted first degree robbery.[12] Therefore, we find that the record supports Weber's request for a lesser included offense instruction on Offensive Touching.

"Lesser included offense instructions 'provide the jury with a less dramatic alternative than the sharp choice between conviction of the offense charged and acquittal[,]' " [13] and "ensures that the jury will accord the defendant the full benefit of

8. 11 *Del. C.* § 206(c).

9. *Webb v. State*, 663 A.2d 452, 462 (Del.1995) (citing *Miller v. State*, 426 A.2d 842, 845 (Del. 1981)).

10. *Bentley v. State*, 930 A.2d 866, 875 (Del. 2007).

11. Naspo gave conflicting accounts of: his location in relation to his car when the man approached him; which hand held his car keys; and what the man said to him when the man approached him.

12. Although a conviction on Offensive Touching does not require evidence that the victim felt offended or alarmed, we note that Naspo testified that he felt "shook up" and "shocked" following his tussle with the man at the gas station, which appears inconsistent with the trial judge's rationale for refusing to give the lesser included offense instruction.

13. *Bentley*, 930 A.2d at 875 (citing *Henry v. State*, 805 A.2d 860, 864 (Del.2002)).

the reasonable-doubt standard" [14]. The trial judge here failed to accord Weber this full benefit of the reasonable doubt standard by refusing Weber's request for a lesser included offense instruction on Offensive Touching.

■■ A trial judge's "failure to properly instruct the jury regarding a lesser offense is not reversible error *per se*." [15] For example, "in cases involving offenses on a ladder, if the trial court wrongfully refuses to charge the offense at the bottom rung, that error is harmless provided the jury returns a guilty verdict for an offense higher up rather than for an intermediate offense which was also charged." [16] This exception does not apply to the case at bar because the trial judge only instructed the jury on the highest offense (First Degree Robbery).

Nor can the fact that the jury convicted Weber on Attempted First Degree Carjacking render the trial judge's error harmless. It is possible to find a defendant guilty of carjacking and not guilty of theft (an element of First Degree Robbery), if the jury finds that the defendant did not intend to permanently deprive the owner of his vehicle. A reasonable jury could have convicted Weber on Attempted First Degree Carjacking and Offensive Touching. For these reasons, we must reverse Weber's conviction of First Degree Robbery.

## B. The trial judge's ex parte communications with the jury.

■ Weber next complains of four allegedly improper communications between the trial judge and the jury, which occurred at various points throughout the four day trial. As we must, we discuss each of these communications individually on its merits. We are constrained to point out that there should *never* be occasion for a judge to engage in *any ex parte* communications with the jury. Any "administrative" or "ministerial" information imported to the jury should be in writing or on the record in open court or proposed in chambers with counsel present and available to comment on the record. While to some judges the urge to be "folksy" and "familiar" to the jury may be appealing, those desires when fulfilled create less appealing, appealable issues for counsel and the Supreme Court. Pages and pages of briefs, time and resources have been ill spent in this case as a result.

At the end of the first trial day and after the jury left the courtroom, the trial judge stated: "All right, we'll stand in recess. I'll take the court reporter to the jury room." Weber claims that "[he] requested the whole trial be transcribed but this was missing from the transcript and attempts to locate this portion of the transcript were not successful; therefore we have no record of what was said to the jury on this occasion." Weber asserts that the lack of a transcript of this apparent communication between the trial judge and the jury is grounds for reversal. Weber relies on the following language from *U.S. v. Novaton:*

> We previously have considered what to do when a incomplete record is supplied to us, and have stated that "[i]f the defendant is represented by the same attorney at trial and on appeal, a new trial may be granted only if the defendant can show that the failure to record and preserve a specific portion of the

---

**14.** *Beck v. Alabama,* 447 U.S. 625, 634, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

**15.** *Lilly,* 649 A.2d at 1062 (citing *Ross v. State,* 482 A.2d 727, 736 (Del.1984)).

**16.** *Geschwendt v. Ryan,* 967 F.2d 877, 882–87 (3d Cir.1992), *cert. denied,* 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 379 (1992).

trial visits a hardship on him and prejudices his appeal." A criminal defendant's entitlement to a new trial based on the incompleteness of the record, however, is "premised upon the district court's inability to reconstruct the record." [17]

Unlike the defendant in *Novaton*, Weber cannot "show that the failure to record and preserve a specific portion of the trial visits a hardship on him and prejudices his appeal." [18]

Weber does not explain how this first *ex parte* communication prejudiced him or affected his right to a fair trial, and the transcript suggests that if the trial judge said anything to the jury it most likely concerned scheduling issues. The transcript reflects the following conversation between the trial judge and a witness:

> **Trial Judge:** Sir, do you understand you can't talk about the substance of your testimony or what it has been or what it might be? Do you understand?
>
> **Witness:** Yes.
>
> **Trial Judge:** And you have to come back tomorrow, but, again, so do I, so we'll both be here together.
>
> **Witness:** Ok, that's fine.
>
> [...]
>
> **Trial Judge:** All right, we'll stand in recess. I'll take the court reporter in the jury room.
>
> (Jury Dismissed to March 18, 2005 at 9 a.m.).

The transcript states: "Jury dismissed to March 18, 2005 at 9 a.m." Therefore, it is reasonable to infer that if the judge said anything to the jury, it was only that they should return at 0900 the next morning.

The next allegedly improper communication occurred on the second trial day. Weber cites (in its entirety) the following exchange regarding a witness's availability:

> **Trial Judge:** Well, ladies and gentlemen, I finally do have something to blame on somebody else.
>
> **Prosecutor:** A sick man. Your Honor.
>
> **Trial Judge:** Okay, that's better than what I did yesterday and in this life, you've got to take what you can get, do you know what I mean?
>
> It happens and the officer is unavailable until Monday. And if he's not available Monday, he'd better be dead, [Prosecutor].
>
> **Prosecutor:** I'll convey that message.
>
> **Trial Judge:** Unfortunately, as some of you probably known, this is the flu season and we've been touched by it in a number of ways. It's—we have— I anticipate at most we will have two more witnesses, the officer and perhaps maybe another witness possibly, maybe not, but I'm, convinced now that the evidence and the case will be put before you Monday afternoon. You will not have to come in until two o'clock on Monday and the reason for that—I know I have, again, no one to blame it on but me—I have civil motions from 9 to 10, I have a pretrial conference, and then I have case reviews from 10 to 12 and Re–Entry Court calendar from 1 to 2 and then I meet with you guys. So I seem to have a reverse amenability hearing at 4, but that won't go. I'll move that. So at least I'm not lonely. So if you'll pardon me, I didn't think we were going to be quite this quick, but it happens. And—now, that's the bad

---

**17.** 271 F.3d 968, 993 (11th Cir.2001) (citations omitted).

**18.** *See id.*

news. Well, I don't know if you consider that bad news or not, that you're free at 10:30, that you don't have to come in until two o'clock on Monday. Maybe I'll become a member of the jury. To the extent I need to, I apologize for that. And if we had two good clear days, we could have done it, maybe one and a half, but it happens, and if you're here, we'll get it done. We'll get it to you. We'll get it to you on Monday. Now, it could take you two days, two hours, two minutes. However long it takes, I don't know. Never been able to call that one right. But when I say we'll get it to you Monday, that's when you'll have it to decide. You'll have a copy of the charge and so on and so forth.

Anybody need anything for employment purposes or—

**Juror:** I have to have a note.

**Trial Judge:** Today or when do you need it?

**Juror:** Yes.

**Trial Judge:** All right, the bailiff will take you. You can go downstairs and they'll give it to you. If you need anything else, either call directly or on Monday and I'll give you a note. Again, they can't tell if you were here for two months on jury duty and that might be a problem.

All right, anybody else have any other questions? Need anything?

All right. It's a beautiful day. So when you go home or go to your boss or spouse or significant other, you say, I really had a hard time today, we were sweating all day, you're out in the park having a picnic lunch, I'm not going to tell.

And did you go in at five o'clock?

**Juror:** Yeah, I have to go back.

**Trial Judge:** I'm not ordering that. If you go back or not go back, you're on your own. As long as you're back here on Monday at two, I don't care. But it is going to be a nice day. So if you're going to get kicked out somewhere earlier, I think this is the time to do it.

Do you want me to issue an order closing your business down?

**Juror:** No, I want my bonus at the end of the year.

**Trial Judge:** Oh, I can't help you there. Remember my admonitions I gave you. I'll see you Monday at two o'clock. I'll keep my fingers crossed nothing else happens, but with my luck, we never know. See you then.

This exchange occurred in open court, with counsel present. Weber offers no reason why this communication prejudiced his right to a fair trial, and we perceive none.

Weber then cites the following recorded exchange, which occurred in the jury room without Weber or his counsel present, as the third allegedly improper *ex parte* communication:

**Trial Judge:** I have good news and bad news. I can think of good news. I thought I would tell you that anyway. We could finish today, but let me tell you what the lineup is, I have about an hour and 15 minutes to an hour and a half of closing between the two attorneys. I have 25 to 30 minutes charge could be a little less than that. So that puts us about six o'clock before you get it. I can't avoid that. Now, I cannot bring you—I can continue it until tomorrow at ten. I don't know what that does to you. I kind of thought honestly that we would be done today. The charge—I was working on the charge. I have the charge, instructions on the law to you. I have to offer you the opportunity to

stay. Now, I must confess that it is up to you, it has to be unanimous. Stay later now, but it is up to you. I have another hearing following this one. I won't die if I don't get that one. I am going to be here with someone this evening one way or the other. I will step out, you can throw things. Is there a human cry for staying until six o'clock? How many people are willing to stay until six o'clock? How many people are not willing to?

**Juror:** I have to start at six.

**Trial Judge:** Can everyone show up at ten o'clock tomorrow? Is there anybody who can't show up at ten o'clock? Then I will instruct you to remember the admonitions I gave you and I will let you go no until ten o'clock tomorrow. We will start with instructions and closings and—

**Juror:** What does tomorrow consist of?

**Trial Judge:** That's all. When you come in, because I am such a nice person, we are going to order lunch from that great gastronomical establishment Leo and Jimmy's. You get the finest sandwich and best ginger ale and Coke and Dr. Pepper you can get. Herr's potato chips.

**Juror:** You said it takes about maybe two and a half hours.

**Trial Judge:** I am estimating, State has opening and rebuttal—closing. Defense has the response. So then I have to charge, which is in two parts. Before they close to do one part of it, then I do the balance of it when they finish. It is given to you. I mean, I never like to estimate how long lawyers will be. I don't oppose—I don't stop them in State Court when you see jurors rolling their eyes or falling off, I think it is time to stop. In 15 years I have not had that problem. I have had some long arguments. They are in very long cases, usually if it is going to be that long you break up hour and a half, let people stretch because at no point lawyers—no point if you are arguing if when your eyes are open if your mind is in West Texas, but this won't be that way. I usually can tell.

**Juror:** I am supposed to be at work at one so I can call into my boss.

**Trial Judge:** Are you doing inventory?

**Juror:** My time to close. I am closing manager tomorrow night.

**Trial Judge:** Up on 202?

**Juror:** Guys will play with me as long as I am there by five o'clock.

**Trial Judge:** They can play with you or play with someone—be in the big house when I lock them up? He had been real good. A short man with a bad attitude.

**Juror:** He told me time for you to go today.

**Trial Judge:** We will let you go now. We will see you tomorrow.

The trial judge presumably returned afterwards to the courtroom to inform counsel that the trial would be continued until the next morning. The transcript does not include this apparent communication between the trial judge and counsel. Weber claims that the trial judge "informed counsel that the jury wanted to go home and proceeded to tell counsel what [the trial judge] told the jury which was not the same as the record shows." Weber fails to identify, however, any difference between what the judge told counsel about his communication with the jury and what the transcript of that communication shows.[19]

---

19. Weber also failed to satisfy Supreme Court Rule 9(g), which provides:

Record in lieu of transcript.—In any case in which the testimony or other pertinent mat-

The fourth allegedly inappropriate *ex parte* communication occurred on the fourth trial day. Weber cites the following exchange, which began in the jury room and continued in the courtroom:

**Trial Judge:** Ladies and gentlemen, it is Mel's fault, how about it's John's fault. We are about to start. I have no great excuses, I do because I was in a conference with 6 attorneys on another case. Story of my life. We are ready to go. I thought I would tell you myself, but that once again it was his fault. I have been doing work. I have not been having fun haven't had any coffee or doughnuts. I am going to shop at your store. I am going to get you out of here. Thank you for your patience, assuming I survive to go in and charge the jury, we will get started right now. I swear I get you out of here within two hours.

(The Judge and court reporter returned to the courtroom)

**Trial Judge:** I went to the jury and made a couple of jokes, told them I attempted to make a couple of jokes. Told them that I gotten tied up. And one of the jurors said it is getting close to that two year point. One other juror who has worked in the retail outlet I said you don't have any weapons do you? She said not yet. I think they are okay. Mr. Kilgore said they are in pretty decent humor.

In his briefs to this Court, Weber does not explain why he believes this fourth *ex parte* communication affected his right to a fair trial. At oral argument, however, Weber asserted that the trial judge's joke about whether a juror had any weapons prejudiced his rights because, in the case at bar, Naspo claimed his assailant threatened him with a gun.

 All of our precedents addressing a trial judge's *ex parte* communications with a jury involve a *deliberating* jury.[20] In those cases, we held that it is improper for a trial judge to communicate with the jury without notice to, or in the absence of, counsel.[21] It is clear, however, that *ex parte* communications between a trial judge and the jury are improper at *all stages* of criminal proceedings. The ABA Standard for Criminal Justice 15–4.3 ("Judicial communication with jurors") provides:

(a) All communications between the judge and members of the jury panel, from the time of reporting to the court-

ter has not been stenographically recorded, any factual material which shall be necessary to the disposition of the issues may be certified by the trial court, and, when filed with the clerk of that court shall become part of the record. In any such case, the matter so incorporated in the record shall be so prepared as to present only the rulings of the trial court on matters of law and shall contain only such statements of fact as may be necessary to review those rulings. The parties may enter into a stipulation as to the substance of testimony or other proceedings as may be essential to a decision of the issues to be presented on the appeal, whether or not a stenographic record has been made. The stipulation shall be approved by the judge of the trial court and

certified to this Court in lieu of a transcript and without the necessity of the directions required under subparagraphs (ii) and (iii) of paragraph (e) above. Delay in the preparation of such statement shall not enlarge any of the time periods established hereunder.

**20.** *See, e.g., Anderson v. State*, 695 A.2d 1135, 1139 (Del.1997); *Desmond v. State*, 654 A.2d 821, 826–27 (Del.1994); *McCloskey v. State*, 457 A.2d 332, 337–39 (Del.1983); *Loatman v. Patillo*, 401 A.2d 91, 92 (Del.1979); *Hyman Reiver & Co. v. Rose*, 147 A.2d 500, 505 (Del. 1958).

**21.** *Jacobs v. State*, 418 A.2d 988, 988 (Del. 1980).

room for voir dire until dismissal, should be in writing or on the record in open court. Counsel for each party should be informed of such communication and given the opportunity to be heard.[22]

We conclude that all *ex parte* communications between a trial judge and jury (*i.e.*, not just contact with a deliberating jury) are "pregnant with possibilities for error," and "that even an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise." [23]

The United States Supreme Court's summary of the problems inherent in *ex parte* communications with a deliberating jury applies equally at all stages of criminal proceedings:

First, it is difficult to contain, much less to anticipate, the direction the conversation will take at such a meeting. Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views.... Second, any occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants.... Finally, the absence of counsel from the meeting and the unavailability of a transcript or full report of the meeting aggravate the problems of having one juror serve as a conduit for communicating instructions to the whole panel.[24]

By simply entering the jury room, with or without a court reporter, the trial judge risks overhearing jurors' comments that may taint that judge's impartiality, particularly that judge's ability to rule on post trial motions.

█ *Ex parte* communications between the trial judge and jury, however, do not constitute reversible error *per se* and are subject to a harmless error analysis.[25] According to the United States Supreme Court,

A defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.... [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." [26]

The dispositive factor in determining whether a trial judge's improper communication with a deliberating jury constitutes harmless error "is often whether the communication was ministerial or substantive in nature. If ... [it] is only ministerial, it may be harmless error. If ... [it] is of a substantive nature ... it is more likely that an appellate court will conclude that the error requires a new trial." [27] In either case, the defendant does not have the burden of proving that actual prejudice resulted from the trial judge's improper communication, but must show that *actual*

---

**22.** *See* ABA Standards for Criminal Justice: Discovery and Trial by Jury, p. 227 (3d ed. 1996).

**23.** *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 460, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978).

**24.** *Id.* at 460–61, 98 S.Ct. 2864.

**25.** *Anderson*, 695 A.2d at 1139. *See also U.S. v. Gagnon*, 470 U.S. 522, 526–27, 105 S.Ct.

1482, 84 L.Ed.2d 486 (1985) ("The mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right.") (citation omitted).

**26.** *Gagnon*, 470 U.S. at 526, 105 S.Ct. 1482.

**27.** *Id.* (internal citations omitted).

prejudice is manifest on the record or at least conceivable.[28]

Here, the *ex parte* communications between the trial judge and the jury occurred before the jury deliberations. From our review of the record, we conclude that the trial judge engaged the jury to resolve purely ministerial matters (*e.g.*, scheduling and jurors' need for employment notes).[29] These exchanges did not address any substantive issues of law. Either the court reporter recorded these communications or the trial judge informed counsel of the nature and the content of the exchanges.

 In his Opening Brief to this Court, which consisted primarily of haphazard and lengthy transcript excerpts with no explanation of their relevance, Weber failed to articulate any coherent reason how these communications affected his right to a fair trial. At oral argument, however, Weber's defense counsel finally managed to articulate why at least one of these *ex parte* contacts might have prejudiced him. Weber asserts that the trial judge's apparent joke about whether a juror had any weapons requires that we reverse his convictions because, here, the victim alleged that his assailant threatened him with a gun. Despite Weber's failure to state the merits of this argument within his Opening Brief, as mandated by Supreme Court Rule 14(b)(vi)(A)(3), the interests of justice mandate that we address this argument.

Oddly enough, it is not clear whether the trial judge actually made a comment about weapons in the jury room. Unlike the trial judge's own description of his conversation with the jurors, the transcript does not include any jokes about weapons.[30] That transcript includes the trial judge's other attempts at humor, but does not include any reference to weapons. Given the trial judge's own account of that conversation, we will assume that he actually asked a juror: "You don't have any weapons do you?" Although we also assume that a valid reason exists for why the transcript does not match the trial judge's recollection, we must make it clear that it would be entirely inappropriate for a court reporter to select which statements to record.

Assuming that the trial judge made the inappropriate weapons comment, we conclude that this *ex parte* communication constituted harmless error. The trial judge entered the jury room to apologize for delaying that day's proceedings, a purely ministerial matter. In doing so, the trial judge apparently made an offhand joke about whether a juror had any weapons (the speculative joke being that that a juror might use a weapon to get revenge for the trial judge's tardiness). While in the jury room, the trial judge did not discuss any legal issues and made no reference to Weber or to the particular facts of the case. Given the context, the trial judge's inopportune reference to weapons did not unfairly prejudice Weber.

For these reasons, we conclude that the *ex parte* communications between the trial judge and the jury, although lengthy and

---

**28.** *See Anderson,* 695 A.2d at 1140.

**29.** *See U.S. v. Pressley,* 100 F.3d 57, 60 (7th Cir.1996) (*ex parte* communications with a jury required reversal when they "touched upon a 'fundamental issue' rather than 'housekeeping matters.'") (citing *U.S. v. Smith,* 31 F.3d 469, 473–74 (7th Cir.1994)).

**30.** The transcript of the trial judge's discussion with the jury is also void of any mention of "getting close to that two year point." This discrepancy highlights the fool hardy risks of cruising into a jury room with or without a court reporter rather than conducting the business of the court in a public courtroom with counsel present.

unnecessary, nevertheless constituted harmless error beyond a reasonable doubt. These communications did not, separately or cumulatively, violate Weber's right to a fair trial.

### C. The trial judge's allegedly improper statements to Weber's counsel.

 Weber next claims that the trial judge made several improper statements to his defense counsel that, individually or cumulatively, violated Weber's right to a fair trial. Weber cites three exchanges between the trial judge and his defense counsel, but provides little or no explanation of how those exchanges unfairly prejudiced his rights.[31] Because Weber did not request a curative instruction to obviate the prejudice that he now asserts, we review Weber's claim for plain error.[32]

Weber first cites the following exchange at sidebar:

**Trial Judge:** As an aside, I think the officer identified [Weber's defense counsel] as the person he picked up.

**Prosecutor:** Identified who?

**Trial Judge:** [Weber's defense counsel] as the person that they picked up. I figure there's no miscarriage of justice there.

**Prosecutor:** They wouldn't have let him go.

**Trial Judge:** Good point.

Weber fails to provide any analysis regarding how this exchange affected his right to a fair trial. Although the trial judge was apparently attempting to make a joke at the expense of Weber's defense counsel, we find no plain error.

Weber next cites the following exchange from the same sidebar as the above comment:

**Trial Judge:** Let [Weber's defense counsel] finish.

**Defense counsel:** I mean—

**Trial Judge:** That unnerves me. I don't need those things in the courtroom, the phone.

**Defense counsel:** It's off. It's silent.

**Trial Judge:** Just take it off.

**Defense counsel:** That's fine. I didn't know where to put it.

**Trial Judge:** I was going to—I was ready to give you a suggestion, but that would be both rude, inappropriate, and highly improper.

Weber's defense counsel explains:

"The Trial Court was referring to my cell phone which was off but apparently the Court did not like it that it was clipped to my waist. The phone did not go off since it was turned off but the Trial Court made an issue out of it in front of the jury that they knew what was occurring."

Contrary to Weber's assertion that the trial judge "made an issue out of [defense counsel's cell phone] in front of the jury," the record reflects that the exchange occurred during a sidebar conference. The trial judge deemed the cellular phone clipped to defense counsel's waist distracting and instructed him to remove it. Despite the trial judge's surprising comment following that request, the trial judge, nonetheless, properly exercised his authority to maintain courtroom decorum.[33] We find no plain error.

---

**31.** In his Opening Brief, Weber's defense counsel summarily argues: "Clearly [...] all these statements were improper and made it impossible for Weber to receive a fair and impartial trial."

**32.** *See Keyser v. State,* 893 A.2d 956, 961 (Del.2006).

**33.** *See, e.g., In re Hillis,* 858 A.2d 317, 321 (Del.2004) (discussing the court's inherent authority to maintain order and decorum); *United Mine Workers of America v. Bagwell,*

Finally, Weber cites the following exchange:

**Trial Judge:** What are you getting ready to ask?

**Defense counsel:** I was going to ask him—

**Prosecutor:** Can we do this at sidebar?

**Trial Judge:** If you are going to ask him a question that I already ruled on, the answer is no. You did not look at driver's license DMV information. Unless you have something else that we did not discuss at sidebar, if you have something else that I did not rule on, come on over we will talk about it.

**Defense counsel:** That's fine.

[At sidebar]

**Defense counsel:** I was going to ask him was that when you take pedigree, do you confirm the information from pedigree from the motor vehicle license; weight, height—

**Prosecutor:** Then the next he is trying to get into the glasses thing, Your Honor, that is where he is going with this. He is trying to backdoor it. I don't have a problem if he—

**Trial Judge:** You are cutting me off. Now, if you ask him does he confirm it, but he said he did not see the driver's license, he did not look at it, there is nothing—no other reason once he said that.

**Defense counsel:** I believe he said I don't remember. I don't recall.

**Trial Judge:** He said he didn't recall, that is kind of the end of it. There is nothing else if he says he did not see it, he didn't recall, didn't recall looking at it, then you are going ask him was

he wearing glasses or something he did not see. So unless you can get him to say I saw something, he already said no. I think we are kind of stuck with that answer. Even if he did see the driver's license, at that point in time, he said he wasn't wearing glasses at the time that he was arrested, so, you know, comes a little more of a demur, so what. I don't know what else to do.

**Prosecutor:** I will avoid a situation where [defense counsel] blurts out glasses in his question. Then that puts me in a position.

**Trial Judge:** If he does that, I will do it twice. You will get sanctioned.

**Defense counsel:** I don't intend to do that, not trying to do that.

**Trial Judge:** This is a strict liability situation, if you do it, then you pay a penalty for it. I don't see—you don't have anything else. He did not see the license, did not compare it, and the fact that he may be required to wear glasses when he legally drives, of course he wasn't driving, legally driving a car at the time, the State's case is to be believed. So let's go ahead get on everything else through in that regard, then move on.

**Defense counsel:** Fine.

Again, Weber does not explain how this exchange affected his right to a fair trial, and we discern no plain error.

In his Reply Brief, Weber makes a general allegation (unaccompanied by precise and pertinent references to the record) that the trial judge's hostility towards his attorney throughout the trial deprived him

512 U.S. 821, 831, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) ("Courts independently must be vested with 'power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates....' ") (quoting *Anderson v. Dunn*, 6 Wheat. 204, 19 U.S. 204, 227, 5 L.Ed. 242 (1821)).

of his right to an unbiased judge.[34] Weber specifically claims that:

> When one looks at the whole trial and the number of statements and comments made about the undersign [*i.e.*, Weber's counsel], it is clear that the Trial Judge had an issue with the undersign. That issue clearly made its way to the jury and denied [Weber] his Constitutional Right to a fair and impartial trial. The conflict between the undersign and the Trial Judge continued to the point that the Trial Court has excused himself from the undersigns' case after the trial in this case.

Because Weber did not fully and fairly present that argument, either below (in the form of an objection to the trial judge's allegedly improper conduct) or in his Opening Brief, we review it for plain error.[35]

Our review of the transcript reveals that the trial judge occasionally made inappropriate statements and, at times, a cold record suggests a less than friendly attitude towards Weber's defense counsel. The record, however, does not support Weber's contention that the trial judge was "biased" or "hostile" towards Weber's defense counsel. We therefore conclude that the trial judge's statements and arguable "attitude" toward Weber's defense counsel did not violate Weber's right to a fair trial.

### D. The trial judge's allegedly improper statements to Weber.

Weber next argues that the trial judge improperly threatened to hold him in contempt when Weber struggled to answer a question regarding the substance of a potential witness's testimony. Weber asserts that this threat had a "chilling effect" on his ability to present a defense. Weber previously requested a continuance because of illness, and later unavailability, of one of his witnesses. A different judge than the trial judge denied that request. The trial judge did know of this previous request, which led to the following:

**Trial Judge:** Mr. Weber, have you made a decision whether or not to testify?

**Weber:** Yes, Your Honor. Just for the record I would like to state that it has been my intention to testify at this trial, but due to the Court's decision not to grant me a continuance because one of my witnesses was sick and was unavailable to appear in court, I was unable to lay a foundation for my defense, which case, I have no choice but not testify at this point.

**Trial Judge:** I have no idea what you are talking about. I did not deny any continuance.

**Defense counsel:** It was in front of [a judge other than the trial judge].

**Prosecutor:** I don't believe that was on the record either.

---

**34.** Weber relies on *Walberg v. Israel*, 766 F.2d 1071, 1076–77 (7th Cir.1985), which was not cited in his Opening Brief. In *Walberg*, the court reversed a defendant's conviction, finding that the judge's attitude amounted to a violation of due process. *Id.* The court noted:

> Although most cases of bias by trial judges have involved the question whether the judge's bias was likely to influence the jury, that is not an essential element. Even when the biased judge neither is the trier of fact nor is shown to have conveyed his bias to the jury that is the trier of fact, there can be a violation of due process which requires a reversal of the conviction. [...] It is also true that the judge's prejudice in this case was directed toward the lawyer rather than the client. But the judge who is so hostile to a lawyer as to doom the client to defeat deprives the client of the right to an impartial tribunal.

> *Id.*

**35.** Supr. Ct. R. 8 and 14(c).

[ . . . ]

**Weber:** I would like to state for the record—

**Trial Judge:** I am trying to figure out what we are talking about.

[ . . . ]

**Trial Judge:** What was Ms. Blake Tracy going to testify to—

**Weber:** I had eight witnesses that were going to testify in my defense. I had planned to put on a very spirited defense. I—without getting into any facts of the case, I want to state factually I am legally innocent of those charges.

**Trial Judge:** Mr. Weber, it's been a real long day, it is going to be longer afternoon. I don't feel like playing—

**Weber:** Well, Your Honor—

**Trial Judge:** Don't ever interrupt, too, in this particular time.

**Weber:** I apologize Your Honor.

**Trial Judge:** I ask a simple question. I don't know anything about any continuance. I don't know anything about any witness. I don't know anything about a spirited defense. I don't care what success or failures you had with the criminal justice system at this point in time I just don't care. So, let's not waste my time and your time for you trying to set a record that may help you at some other point in time other than which is in the normal course of business. I don't think we really want that. That are that kind of disruption that leaves me or leads me to Penal Section 1271, which is Contempt. That is summary disposition of a situation. So why don't we go there today. Why don't we not play with me today because it wouldn't be a favorable outcome. I just asked you a simple question. I don't know who Ann Blake Tracy, PHD, you said there was a problem. I asked you about testifying. You said there was a witness that was unavailable. Tell me what Ms. Tracy was going to testify and how that impacts upon your ability to testify?

**Prosecutor:** Can this be done through [defense counsel], he is counsel, and it was submitted under counsel's request?

**Weber:** I guess my problem is—

**Prosecutor:** Excuse me, I made a request to the Court.

**Trial Judge:** Fellows. I asked him a question. He made a representation about some spirited defense.

**Prosecutor:** That was not the reason submitted by [defense counsel] at the call.

**Trial Judge:** Who is Ann Blake Tracy and what does she have to do with this case?

**Weber:** My problem is, Your Honor, if I was to answer that question without at this point in time I feel like I might incriminate myself.

 Weber's claim lacks merit, for two reasons. First, under 11 *Del. C.* § 1271, "[a] person is guilty of criminal contempt when the person engages in ... [d]isorderly, contemptuous or insolent behavior, committed during the sitting of a court [ . . . ]."[36] Here, Weber interrupted the trial judge twice with statements wholly unrelated to the judge's question. The trial judge acted within his discretion by threatening to invoke § 1271.[37]

Second, the record does not support Weber's contention that the trial judge's

---

**36.** 11 *Del. C.* § 1271(a).

**37.** Superior Court Criminal Rule 42(a) provides: "A criminal contempt under 11 *Del. C.*

§ 1271(1) may be punished summarily if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the

threat of criminal contempt had "a chilling effect on [his] ability to present a defense." At the time of this colloquy, Weber's defense counsel already made the strategic decision not to call the other witnesses or to present the defense in question. The trial judge's threat to sanction Weber did not violate his right to a fair trial.

### E. The jury's access to the prosecutor's laptop during deliberations.

■ Lastly, Weber argues that the trial judge denied his right to a fair trial by giving the jury access, during deliberations, "to the [prosecutor's] laptop and everything on the laptop which was not admitted into evidence." When the jury retired from the courtroom to deliberate, the prosecutor left his laptop in the courtroom in case the jury wanted to review a CD copy of the gas station surveillance video.[38] The prosecutor already used this same laptop during the trial to play the video for the jury. It is unclear from the record whether the jury could have played the CD by other means, had the prosecutor removed his laptop from the courtroom and left only the CD.

The prosecutor asserted that, to the extent the jury deemed it necessary to review the CD, he preferred that they watch it on the laptop rather than project it onto the screen.[39] He argued that watching the CD on the laptop would allow the jurors to see the assailant's face more clearly.[40] The prosecutor also represented that the laptop belonged to his son and did not contain any other materials related to the case.[41] Because the record does not rebut those assertions, we conclude that the trial judge did not abuse his discretion by allowing the jury access to the laptop.

### II. Weber's Motion for a Judgment of Acquittal.

Weber claims that the trial judge erred by denying his motion for a judgment of

court." *See also, e.g., In re Hillis*, 858 A.2d at 321 (holding that "the power to punish for contempts is inherent in all courts [and] ... may be regarded as settled law"); *DiSabatino v. Salicete*, 671 A.2d 1344, 1348 (Del.1996) (holding that a court's inherent contempt authority is "essential to the administration of justice.").

38. Weber did not object to the admission of the CD as an exhibit at trial, nor did he object to the jury's access to the CD during deliberations. Weber objected only to the jury's access to the prosecutor's laptop during its deliberations. Weber's defense counsel stated: "[M]y understanding [is that] if [the jury] wanted [to review the videotape], you [would] bring them in here. I don't know what ... [the prosecutor's] notebook ... has on it or does not have [on] it. I have a problem." On appeal, Weber does not contend that the trial judge abused his discretion by admitting the CD as a trial exhibit or to allow the jury to review it during deliberations. To reiterate, Weber contends only that the jury should not have been given access to the prosecutor's notebook. *Compare Waterman v. State*, 956

A.2d 1261, 2008 WL 3877969, at *2–3 (citing *Flonnory v. State*, 893 A.2d 507, 526–27 (Del. 2006)) (holding that the default rule—for 11 *Del. C.* § 3507 statements—is that they "should *not* be admitted into evidence as separate trial exhibits that go ... to the jury room" but that "[t]he trial judge does ... have discretion to depart from this default rule when ... the situation so warrants [*e.g.,*] ... where the parties do not object to having the written or recorded statements go into the jury room as exhibits.").

39. Weber also claims that the jury used the laptop and "in fact viewed the video." As Weber admits, the record is devoid of any facts that support that assertion.

40. The trial judge stated that he could not tell the jurors what to do (*i.e.,* how to watch the CD) but that they would be given access to both the laptop and the projector.

41. The prosecutor stated: "It is my son's. I think his political science notes, any pictures I am not responsible other than the motor vehicle picture would have to be in [t]here."

acquittal. Under this heading, Weber advances three arguments: (1) the State failed to present sufficient evidence identifying him as the perpetrator of the crimes; (2) his right to confront witnesses was violated; and (3) the trial judge should have instructed the jury regarding the weight of the identification evidence.

### A. Sufficiency of the identification evidence.

██ ██ Weber argues that the State presented insufficient evidence at trial to enable a reasonable juror to conclude beyond a reasonable doubt that Weber committed the charged crimes. "We review *de novo* a trial judge's denial of a motion for a judgment of acquittal to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt of all the elements of a crime." [42] Other than identity, Weber does not dispute the sufficiency of the State's evidence regarding the other elements of the charged crimes.

We conclude that the State presented sufficient evidence that Weber was the person seen in the surveillance video accosting Naspo. Although Naspo did not positively identify Weber as his assailant, Hawk independently identified Weber as the person shown on the surveillance video. Naspo was seventy four years old at the time of the incident, which occurred at approximately 10 p.m. Naspo's contact with Weber lasted only a few seconds. Hawk, however, testified that he had known Weber since 1985. Moreover, the jury watched the surveillance tape at trial,

thus enabling the jurors to make their own determination. [43]

On appeal, Weber argues that Hawk could not sufficiently identify Weber as the assailant because: (1) "it [was] clearly the officer's opinion and under Delaware law, only experts can state their opinion;" and (2) the identification was based "on viewing a video and without the opportunity to view a person['s] height, weight, etc. which cannot be judged from a video."

Although Hawk did not testify as an expert witness, a lay witness may also express opinions, if those opinions "are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue and (c) not based on scientific, technical or other specialized knowledge [...]." [44] Weber appears to contend that Hawk's opinion does not satisfy the first requirement because Hawk did not base his testimony on his own perception but rather on his review of the surveillance videotape—a review the jury could have independently performed. This contention is without merit.

Hawk identified Weber based on two factors: his review of the surveillance video *and* his familiarity with Weber's appearance. Not only had Hawk known Weber since 1985 but also he saw Weber on the day of the incident. The jurors did not know how Weber looked on the day of the incident. They only knew how Weber looked at the time of his arrest (from pictures taken at the police station) and how he looked during the trial (through direct observation).

Hawk's opinion also satisfies the second requirement because it was "helpful to a

---

42. *Flonnory*, 893 A.2d at 537.

43. In addition to observing Weber during the trial, the jury also viewed pictures of Weber taken at the time of his arrest.

44. D.R.E. 701.

clear understanding of [his] testimony" regarding why he decided to arrest Weber after having initially released him. Finally, Hawk's identification opinion satisfied the third requirement because it was not "based on scientific, technical or other specialized knowledge," but merely on Hawk's review of the videotape and his personal knowledge about Weber's appearance.

The jury also heard other evidence concerning identification. Naspo originally described his assailant as "a white male, approximately 35 years old, 5′6″, 5′7″ in height, short brown hair, no facial hair, approximately 160 pounds ... The person was wearing jean shorts and a blue t-shirt." Weber matched that description.[45] Alimenti testified that when he stopped Weber approximately 45 minutes after the attempted robbery, Weber was wearing "blue jeans and a large blue shirt, t-shirt." Hawk testified that when he went to Weber's home to arrest him, the first clothing items that Hawk saw on the floor in Weber's bedroom were "a pair of long jeans and an oversized blue t-shirt."

Weber's proximity to the scene of the crime also supports the sufficiency of the State's identification evidence. Responding to a complaint about a person knocking on doors in the Dunlinden Acres development (located cattycorner across the street from the gas station) in search of a ride, Alimenti stopped Weber approximately 150 yards from the gas station in question.

Viewing the evidence in the light most favorable to the prosecution, the State presented sufficient evidence for a rational trier of fact to determine beyond a reasonable doubt that Weber committed the crimes. Therefore, the trial judge did not

err by denying Weber's motion for a judgment of acquittal.

### B. Weber's right to confront witnesses.

Weber appears to contend that the trial judge violated his right to confront witnesses, guaranteed by both the federal and the Delaware Constitutions, by refusing to admit Weber's driver's license into evidence. Weber argues that, without that license, he could not effectively cross-examine Hawk. Weber's driver's license contained a restriction requiring Weber to wear glasses while driving, and the picture on that license showed Weber wearing glasses. The assailant shown in the surveillance tape was not wearing glasses. Hawk testified that, when he saw Weber in the Sleepy's parking lot and when he arrested him, Weber was not wearing glasses. Hawk also testified that he had never seen Weber wearing glasses and did not know of Weber's driving restriction. Alimenti also testified that Weber was not wearing glasses on the evening of the incident.

We find no merit to Weber's argument. On two separate occasions, defense counsel crossexamined Hawk regarding Weber's driving restriction. Therefore, the trial judge did not deny Weber his right to confront witnesses by excluding Weber's driver's license.

### C. Identification instructions.

Weber also contends that the Superior Court "should have [given] a jury instruction on the essential issue of identification." Weber misrepresents the record because the trial judge gave the following standard jury instruction on identification:

---

45. Although Naspo originally stated that his assailant had "no facial hair," the surveillance tape showed that the person who attacked Naspo had a goatee. Alimenti could not recall whether Weber had a goatee or not, but Hawk testified that when he saw Weber in the Sleepy's parking lot, Weber did have a goatee.

A matter that has been raised in this case is the identification of the defendant. You must be satisfied beyond a reasonable doubt that the defendant was, indeed, the one who did the act charged and that this act actually took place before you may find him guilty of any crime. If there is a reasonable doubt about his identification, you must give him the benefit of the doubt and find him not guilty.

Weber did not object to the form of this instruction, which represents a correct statement of the law.[46]

### III. Weber's Motion for a Continuance.

▮▮▮▮ Weber's third claim is that the trial judge erred by denying his motion for a continuance "and in essence not allowing him to present his defense." We review the denial of a motion for a continuance for abuse of discretion.[47]

The record reflects that Weber's defense counsel filed a continuance request before trial. A Superior Court judge other than the trial judge denied that request on March 17, 2005. Although the record on appeal does not contain a copy of the request, it appears that Weber requested a continuance because one of the witnesses he planned to call (Anne Blake Tracy, PhD) "was sick and was unavailable to appear in court." There is no transcript of the judge's decision to deny a continuance because the discussion occurred during an unreported sidebar conference. At trial, however, Weber's defense counsel and the prosecutor told the trial judge what occurred during that sidebar conference.

Weber's defense counsel asserted that Weber was taking medication (Effexor) designed to treat people having "blackout[ ] episodes [and] violent tendencies." Tracy,

the Executive Director of the International Coalition for Drug Awareness, would have testified as an expert witness regarding the "affects [sic] [that the] medicine has or could have on [Weber]." According to Weber's defense counsel, Tracy's expert testimony would have gone "to the issue of the ultimate defense of whether the act was intentional or not because [Weber's] state of mind ... [was] basically almost like an involuntary intoxication in his capacity or some type of mental illness because of that medicine."

Defense counsel conceded that Tracy was not Weber's treating physician, but added that the defense was prepared to call seven other witnesses (including Weber's psychiatrist and "two other individuals that would establish he was on this medicine and the affects [sic] of that medicine on him.") Weber personally represented to the trial judge that he had planned on calling eight witnesses and putting on a "very spirited defense." Weber's defense counsel admitted that he requested a continuance solely because of Tracy's unavailability. He contended that the other seven witnesses were potentially available, but "their testimony without [Tracy's] would have been of no value, even if the court allowed it." Weber's defense counsel further informed the trial judge that he and the defendant had made a "strategic decision" not to call any of those other witnesses to testify because counsel was ultimately "not sure that [the] defense [envisioned] would [have been] beneficial to [Weber]."

We find no abuse of discretion in the denial of Weber's motion for a continuance. Weber made that request because of the unavailability of a single witness (Tracy). Contrary to Weber's claim, Tra-

---

46. *See Walls v. State,* 560 A.2d 1038, 1043 (Del.1989).

47. *See Hicks v. State,* 434 A.2d 377, 381 (Del. 1981).

cy's testimony was not central to his defense because: (1) Tracy was not Weber's treating physician; (2) Weber's psychiatrist and other six witnesses were available to testify but defense counsel made the "strategic decision" not to call any of those witnesses; and (3) Tracy's proffered testimony would not have been "beneficial" to Weber (as defense counsel admitted) because the defense gave no notice of its intent to present an insanity defense or expert testimony regarding Weber's mental condition, as required by Superior Court Criminal Rule 12.2.[48]

## IV. Weber's Sentencing as a Habitual Offender.[49]

Weber claims that the sentencing judge violated his right to due process by sentencing him as a habitual offender based, in part, on an earlier Forgery conviction.[50] In 2001, a jury convicted Weber on Second Degree Forgery, for which he received a sentence of thirty days imprisonment. Weber appealed directly to this Court.[51] We rejected that appeal on jurisdictional grounds because Weber's sentence did not include a prison term over thirty days or a fine over $100.[52] Weber now argues that, because he had no right to appeal, his forgery conviction does not qualify as a predicate offense under 11 *Del. C.* § 4214(a).

Generally, we review habitual offender sentencing decisions for an abuse of discretion.[53] Here, however, Weber raises an issue of first impression. We review this question of law *de novo*.[54]

Under 11 *Del. C.* § 4214(a), after a fourth felony conviction a defendant may be declared a habitual offender and given an enhanced sentence. Section 4214(a) provides:

Any person who has been 3 times convicted of a felony . . . under the laws of this State, and/or any other state, United States or any territory of the United States, and who shall thereafter be convicted of a subsequent felony of this State is declared to be an habitual criminal, and the court in which such 4th or subsequent conviction is had, in imposing sentence, may in its discretion, impose a sentence of up to life imprisonment upon the person so convicted.

The Delaware Criminal Code defines a conviction as "[a] verdict of guilty by the trier of fact, whether judge or jury, or a

---

48. Weber's counsel has never articulated precisely the nature of the "ultimate defense" that Tracy's expert testimony would have allowed Weber to pursue. To the extent that Weber's counsel planned to raise a diminished responsibility or capacity defense, that defense is not available in Delaware. *See Bates v. State*, 386 A.2d 1139, 1143 (Del.1978). In his Opening Brief, Weber admitted that the proffered expert testimony would not have enabled him to raise either an insanity defense or a diminished capacity defense. He also admitted that he never gave notice of an intent to raise these defenses.

49. Although the sentencing judge sentenced Weber as a habitual offender in relation to the Attempted First Degree Robbery conviction and not in relation to the Attempted First Degree Carjacking conviction, we address this

matter of first impression to provide guidance to the trial court on remand.

50. The sentencing judge relied on Weber's prior convictions on Receiving Stolen Property, Second Degree Forgery, and Second Degree Assault and Second Degree Burglary.

51. *See generally Weber v. State*, 2002 WL 31235418 (Del.).

52. *Id. See also* DE Const. Art. IV, § 11(1)(b).

53. *See Mayes v. State*, 604 A.2d 839, 842–43 (Del.1992).

54. *Ares v. State*, 937 A.2d 127, 130 (Del.2007) (citing *Downs v. State*, 570 A.2d 1142, 1144 (Del.1990)).

plea of guilty or plea of *nolo contendere* accepted by the court."[55] As used in its general and popular sense, a "conviction" is the establishment of guilt independent of judgment and sentence.[56] The habitual offender statute does not expressly require that a predicate conviction be final or appealable to enhance a sentence.

The State argues that "conviction" simply means the establishment of guilt, and that it is immaterial that Weber could not appeal his Forgery conviction. The State relies on *Pryor v. State*[57], where the defendant received an enhanced sentence under the State's drug offender recidivism statute.[58] Pryor received this sentence based on an earlier offense for which the defendant had pled guilty but had not been sentenced.[59] In *Pryor*, we upheld the sentencing enhancement, despite the fact that Pryor was unable to appeal the predicate offense (there is no right to appeal a conviction before sentencing).[60] *Pryor* is distinguishable, however, because that defendant could have appealed his predicate offense after being sentenced on

that charge, and if the appeal was successful, the enhanced sentence would be vacated. We find *Pryor* helpful but not determinative.

The State further argues that Weber had multiple opportunities to attack his Forgery conviction and that his failure to do so amounts to a procedural default that bars Weber from now attacking his prior conviction. There is a split of authority among the federal Circuit Courts on whether a defendant facing an enhanced sentence may collaterally attack his earlier convictions.[61] The State claims that Weber could have sought: post conviction relief; a writ of habeas corpus; or a writ of certiorari to challenge his Forgery conviction. In actuality, only post conviction relief or a writ of certiorari were available to Weber.[62]

Weber could have petitioned for post conviction relief under Superior Court Criminal Rule 35, which provides that the Superior Court "may correct an illegal sentence at any time . . .,"[63] Weber has

---

**55.** 11 *Del. C.* § 222(3); *see also Lis v. State*, 327 A.2d 746, 748 (Del.1974).

**56.** *See Pryor v. State*, 453 A.2d 98, 100 (Del. 1982) (citation omitted).

**57.** *Id.*

**58.** *See* 16 *Del. C.* § 4763.

**59.** *Pryor*, 453 A.2d 98.

**60.** *Id.*

**61.** *See U.S. v. Custis*, 988 F.2d 1355, 1361–62 (4th Cir.1993) (holding that a habitual offender may not collaterally attack predicate offenses on grounds other than ineffective assistance of counsel); *cf. U.S. v. Gilbert*, 20 F.3d 94, 99 (3d Cir.1994) (holding that a U.S. District Court may (but is not required to) permit a defendant facing an enhanced sentence to collaterally attack his predicate offenses).

**62.** Weber could not obtain review of his Forgery conviction under either federal or state law writs of *habeas corpus*. To petition the federal courts for habeas relief, the petitioner must be "in custody." *See* 28 U.S.C. § 2241(c). The brevity of Weber's sentence would effectively moot any petition for federal habeas relief. Delaware requires that a habeas petitioner be "in custody" or have their "liberty restrained" to seek habeas relief. The brevity of Weber's sentence would also render a state habeas petition moot. *See Taylor v. State*, 2002 WL 31477136 at *1 (Del.). The collateral effects of Weber's Forgery conviction (including potential eligibility for habitual offender status), do not sufficiently "restrain his liberty" to permit habeas relief. *See id.* (holding that the fact that defendant would be placed on probation is not a sufficient restraint of liberty to permit habeas review).

**63.** Del.Super. Ct.Crim. R. 35(a). Superior Court Criminal Rule 61 also provides for post conviction relief, but requires the petitioner to be "in custody."

not explained why he did not seek Rule 35 relief. Had Weber sought Rule 35 relief and been denied, that denial would have been appealable to this Court.[64]

 Weber also could have sought certiorari review of his Forgery conviction. The scope of certiorari review is limited but includes an examination of jurisdiction, errors of law, and mistakes on the face of the record.[65] Weber's failure to pursue Rule 35 relief from his Forgery conviction or to seek a writ of certiorari patently detracts from Weber's due process claims.

 It is clear that the United States Constitution does not guarantee a right to appeal a state law criminal conviction.[66] The United States Supreme Court, however, has specifically held that "the States must afford prisoners some 'clearly defined method by which they may raise claims of denial of federal rights.'"[67] Although the United States Supreme Court has held that the right to appellate review of predicate offenses is not required to enhance a sentence under a recidivism statute,[68] that Court has not made a similar pronouncement with respect to sentencing enhancements. Rather, the Court currently appears to rely on the "numerous opportunities to challenge the constitutionality of [predicate] convictions [in state courts]" as sufficient to protect the due process rights of criminal defendants.[69] Here, Weber could have asserted his federal rights in State Court through a motion for post conviction relief or a writ of certiorari.

We conclude that Weber's 2001 conviction for Forgery Second is a conviction for purposes of the habitual offender statute, and that the unavailability of a direct appeal does not change this result.

## V. Weber's Right to a Speedy Trial.

 Finally, Weber claims that a nearly three year delay between his conviction and his sentencing violated his right to a speedy trial.[70] Essentially, Weber asserts a right to a "speedy sentencing." The United States Supreme Court has not yet addressed whether the Sixth Amendment requires "speedy sentencing."[71] We assume, however, that "an allegedly unconstitutional delay [in sen-

---

64. *See generally Cropper v. State*, 2006 WL 2827640 (Del.).

65. *See Matter of Butler*, 609 A.2d 1080, 1081 (Del.1992).

66. *See McKane v. Durston*, 153 U.S. 684, 687, 14 S.Ct. 913, 38 L.Ed. 867 (1894) Holding: A review by an appellate court of the final judgment in a criminal case, however grave the offense of which the accused is convicted, was not at common law, and is not now, a necessary element of due process of law. It is wholly within the discretion of the state to allow or not to allow such a review. A citation of authorities upon the point is unnecessary. *Id.*

67. *See Case v. Nebraska* 381 U.S. 336, 337, 85 S.Ct. 1486, 14 L.Ed.2d 422 (1965) (citing *Young v. Ragen*, 337 U.S. 235, 239, 69 S.Ct. 1073, 93 L.Ed. 1333 (1949)).

68. *Custis v. U.S.*, 511 U.S. 485, 496–97, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994). The Court's holdings on this matter arise in the context of defendant's challenging sentencing enhancements before the appeals process on their predicate offense is final. Upon a successful appeal of a predicate conviction, however, a defendant is entitled to a reduction in the enhanced sentence.

69. *See Daniels v. U.S.*, 532 U.S. 374, 375, 121 S.Ct. 1578, 149 L.Ed.2d 590 (2001).

70. The police arrested Weber on August 20, 2004. A jury convicted him on all charges on March 22, 2005, and he received his sentence on January 11, 2008.

71. *See Harris v. State*, 956 A.2d 1273, 1275 (Del.2008) (internal citations omitted).

tencing] is examined in the same way as an asserted denial of the right to a speedy trial." [72] We review the alleged infringement of a constitutional right *de novo*. [73]

■ To determine whether a defendant received a speedy trial, we apply the *Barker* balancing test. [74] The four *Barker* factors to be balanced are: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the delay prejudiced the defendant. [75]

■ "The threshold factor, the length of the delay," weighs in Weber's favor. [76] A 2 year, 9 month, and 20 day delay between Weber's conviction and sentencing is sufficiently long, and thus persuades us to examine the other factors. A lengthy delay, however, is not determinative.

The second factor, the reason for the delay, weighs strongly in the State's favor. "[T]he delay may range from inadvertence to deliberate acts...." [77] In examining this prong:

> Different weights are assigned to different reasons for the delay. Benign reasons for trial delays weigh less heavily against the State. A valid reason may justify appropriate delay and will not weigh against the State at all. If the defendant is the primary cause for the delay, this factor will weigh against him,

in part because a defendant may be in a better negotiating position as witnesses (for the State or the defense) become unavailable or their memories fade. [78]

Weber contributed significantly to the delay between his conviction and sentencing. He filed multiple post trial motions, asking the court for: an evidentiary hearing, a status hearing, to merge his offenses, to preclude imposition of his sentence, a new trial, and removal of his counsel. Weber also requested multiple continuances and filing extensions. For example, on June 10, 2005 (Weber's original sentencing date), Weber requested and received a continuance because he "need[ed] more time." He received a similar continuance on September 16, 2005.

Although the State and the Superior Court contributed, [79] it was Weber who caused the lion's share of the delay. Weber acted well within his rights by filing a plethora of motions and requests for continuances, but he must also accept responsibility for the inevitable consequence—delayed sentencing. This factor demonstrably favors the State.

The third prong, the defendant's assertion of his right to a speedy sentencing, is "of considerable significance in determining whether there has been a speedy [sentencing] violation." [80] Contrary to the State's claim that "at no point in the pro-

---

72. *Id.* We have assumed that the Sixth Amendment provides a right to a speedy sentencing since 1973. *See Johnson v. State*, 305 A.2d 622, 624 (Del.1973).

73. *Harris*, 956 A.2d at 1275.

74. *Middlebrook v. State*, 802 A.2d 268, 273 (Del.2002) (citing *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101(1972)).

75. *Id.*

76. *Harris*, 956 A.2d at 1276.

77. *Id.* at 1273.

78. *Id.* at 1276 (internal quotations omitted).

79. The State filed several motions concerning Weber's habitual offender status that delayed Weber's sentencing. The trial judge chose to recuse himself because a potential conflict developed between Weber's defense counsel and the trial judge's wife, which also delayed Weber's sentencing.

80. *Harris*, 956 A.2d at 1277 (internal quotations omitted).

ceedings does it appear that Weber asserted his right to a speedy sentencing," Weber did complain about the delay in sentencing to the Superior Court. Weber filed a motion to dismiss that included a claim for delay in sentencing. At the hearing for this motion, the trial judge explained to Weber that as long as Weber continued to file new motions, the trial court would have to give the parties time to respond, which would continue to delay his sentencing. Weber withdrew this motion to dismiss on October 22, 2007 and sentencing was set for December 14, 2007. Although Weber did not vigorously assert his right to a speedy trial, this factor weighs slightly in Weber's favor.[81]

The fourth factor, prejudice to the defendant, marginally favors Weber. In analyzing this factor, we consider the interests that the right to speedy trial is designed to protect: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired.[82]

The State claims correctly that Weber did not allege any particular prejudice from his delayed sentencing.[83] In his Opening Supplemental Memorandum, Weber summarily argues that "the delay was almost three years and [Weber] remained in jail with no bail during that period," and "[a]fter balancing the *Barker* factors, this Court should conclude that [Weber's] right to a speedy sentencing under the Sixth Amendment and Delaware Constitution was violated." "Although we apply the same analysis in light of the interest of the defendant in a speedy sentencing, in speedy sentencing cases the consideration of the particular interests is diminished." [84] From our review of the record, we find the sentencing delay only minimally prejudiced Weber.

"The outcome of the sensitive balancing of these factors is determined by the weight to be assigned to each factor." [85] Here, we conclude that the reason for the delay (*i.e.*, Weber's barrage of motions and requests for continuances) and Weber's failure to articulate any resultant prejudice tip the scales in favor of rejecting Weber's speedy trial claim.

## CONCLUSION

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND for a new trial on the Attempted First Degree Robbery charge.

---

**81.** Weber dedicates a total of three sentences in his Opening Brief to this claim, with no references to the record and with no analysis of the applicable law.

**82.** *Id.*

**83.** In his Reply Supplemental Memorandum and for the first time, Weber suggests several ways the delay prejudiced him. Because Weber failed to brief fully this issue, the State did not have an adequate opportunity to respond to Weber's particular claims. Therefore, we will not address Weber's specific allegations.

**84.** *Harris*, 956 A.2d at 1277.

**85.** *Id.* at 1278.